652 So.2d 184 (1995)
In the Interest of D.K.L., William James LOGGANS
v.
Ruth Ann HALL, D.K.L., John William Hall and State of Mississippi.
No. 91-CA-01232-SCT.
Supreme Court of Mississippi.
March 23, 1995.
Vera A. Gault, Jackson, for appellant.
Vaughn Davis, Davis & Rogers, C. Bradley Carter, R. Jack Brantley, Jr., James W. Younger, Jr., Joe B. Moss, Jackson, for appellee.
En Banc.
PITTMAN, Justice, for the Court:

STATEMENT OF THE CASE
On January 9, 1990, the Hinds County Youth Court entered an order directing the Hinds County Department of Human Services to proceed with filing a Petition against John William Hall. Subsequently on January 12, 1990, the Department of Human Services filed a Petition in the Hinds County Youth Court, alleging D.K.L., age 5 1/2, to be an abused child within the meaning of Miss. Code Ann. § 43-21-105 (1972). An order appointing Brad Carter as guardian ad litem for D.K.L. was also entered.
While these proceedings were progressing in the Hinds County Youth Court, John William Hall, D.K.L.'s stepfather, entered a plea of guilty to a charge of "gratification of lust" in the Hinds County Circuit Court on April 10, 1991. The State alleged that Hall "on December 16, 1989 touched the vaginal area of a child D.K.L. for purposes of gratification of lust". Hall pled guilty and an order by the Circuit Court was entered on April 10, 1991, whereby the court withheld adjudication and imposed certain conditions of probation. The order conditioned Hall's guilty plea on the following:
THEREFORE FOR SAID PLEA OF GUILTY ON A CHARGE OF Gratification of Lust and with the consent of John William Hall being expressed in open court, the court specifically withholds acceptance of defendant's plea and adjudication of guilt and imposition of sentence in accordance with § 41-29-150(d)(1), Mississippi Code of 1972, as amended, pending successful completion of the conditions imposed in this Order.

*185 (m) And further, that the defendant obtain and complete treatment for sexual abuse by competent psychologist/therapist appointed by the court; provide therapy for the victim D.K.L. by competent professional; attend and participate successfully in Alcoholics Anonymous; and shall not be alone with the female child under the age of 14 without other adult presence and supervision... .
Should the court find that the Defendant has failed to comply with the terms and conditions imposed herein, the Court shall immediately accept Defendant's plea of guilty and proceed to sentence him/her.
Subsequent to the entry of this Circuit Court order, Ruth Ann Hall requested the Youth Court to modify its holding rendered in 1989. As a result of an earlier proceeding in the Youth Court, certain prohibitions were imposed on the Hall family. Ruth Ann sought to have these restrictions removed so that John Hall could return to the marital home and be reunited with his wife Ruth Ann, child Jacob and stepchild D.K.L. William James Loggans, D.K.L.'s natural father, opposed these proceedings. A hearing in the Youth Court was held on July 30, 1991.
The Youth Court issued its opinion and orders on August 27, 1991. An amended order was later entered on September 10, 1991. These orders found the child to be an abused child within the purview of the Youth Court Act; determined that it was in D.K.L.'s best interest to remain in the care and custody of her mother; ordered that the child should continue therapy when needed; and further removed all other restrictions placed on the family and permitted Hall to return home. However, the order also stated that Hall's return was predicated on the restrictions set out in the Circuit Court order of April 10, 1991. In addition, the Hinds County Department of Human Services was to supervise for a period of not less than 90 days.
On September 20, 1991, William Loggans filed a Motion for Reconsideration and/or New Trial. A hearing was held on the motion on October 22, 1991, and the court on November 19, 1991, denied Loggan's motion.
Aggrieved by the findings of the Youth Court, Loggans filed his Notice of Appeal to this Court and alleges the following as error committed by the lower court:
I. THE LOWER COURT COMMITTED MANIFEST ERROR IN FINDING THAT D.K.L. SHOULD REMAIN IN HER MOTHER'S CUSTODY AND ALLOWING JOHN WILLIAM HALL TO RETURN TO THE HOME
II. THE LOWER COURT COMMITTED MANIFEST ERROR BY FAILING TO APPOINT AN INDEPENDENT THERAPIST TO EVALUATE D.K.L.
III. THE LOWER COURT WAS MANIFESTLY WRONG IN DENYING APPELLANT'S MOTION FOR RECONSIDERATION AND/OR NEW TRIAL
Finding that the guardian ad litem, appointed to represent the interests of the minor child, failed in his duties, we reverse and remand.

STATEMENT OF THE FACTS
William Loggans and Ruth Ann (Loggans) Hall were married on February 11, 1983. A child, D.K.L., was born of this marriage on June 12, 1984. Two years later, William and Ruth Ann were granted a divorce on the grounds of irreconcilable differences. The divorce decree was entered on July 17, 1986. Subsequently, Ruth Ann married John William Hall. In December of 1989, Emma Lee Loggans, D.K.L.'s paternal grandmother, brought D.K.L. to St. Dominic's Hospital as the child was having pain in her vaginal area. On September 21, 1990, the Hinds County Youth Court ordered the Department of Human Services to investigate John Hall concerning the allegations of sexual abuse. After investigation, charges were brought against Hall in the Hinds County Circuit Court. Hall plead guilty to these charges. Following the hearing in Circuit Court, Ruth Ann, John and D.K.L. attended therapy sessions.
Two hearings were conducted by the Youth Court for the purpose of determining whether John William Hall would be permitted to return to the marital/family home. Mrs. Ruth Ann Hall initiated the first hearing *186 in the form of a rehearing of the earlier case heard by the Youth Court in 1989.
The first hearing was held on Tuesday, July 30, 1991. Among the expert witnesses who testified was Dr. Charlton Stanley, a psychologist in private practice. Stanley began a professional relationship with John Hall in January of 1990 wherein he conducted several types of tests. In his treatment and analysis of John Hall, he failed to pick up any sexual deviancies: "I picked up some pathology, obviously related to alcohol; but I didn't pick up any sexual deviancy at all." Stanley stressed the importance of Hall attending AA meetings and reported that Hall "had been on the wagon since late January of 1990" and had made considerable improvement in this regard.
The relationship between Hall and Stanley comprised approximately 21 sessions and continued until April 1990. It was Stanley's ultimate opinion that the "no-contact" order against Hall be removed. In addition, Stanley was aware of the order that required an adult to be present when Hall was with his stepdaughter, however he stated that he was not 100% sure that sexual abuse took place and that to the best of his knowledge only one incident was discussed by D.K.L. and Mrs. Hall. "Whatever happened, I am convinced, happened as a result of alcohol. Like I said, I'm not sure exactly what happened... . So, if there's a relationship problem with the child, I think it's due to alcohol." Furthermore, Stanley stated "[W]hen I finally cut John loose last spring, in April, I didn't feel like I had taken him as far as I could in individual therapy and wanted him to be in family therapy and to try to hopefully rebuild his family... ." "I don't envision him abusing her again, ever, even if he were to get drunk... . I think he's had the daylights scared out of him."
When asked what restrictions should be placed on Hall seeing D.K.L., Stanley responded: "I probably wouldn't put any restrictions; but, if you want to do a step down procedure for you know, the next year or two, only in the company or accompaniment of another adult, ... but I don't have any problems just turning him loose, right now  especially as long as they're still in therapy."
Stanley's testimony is very inconclusive, with little discussion about Hall sexually abusing the child. In addition, there was little discussion about treating or preventing the abuse from recurring. There were no statements of concern for the safety of D.K.L.
Sue Ann Meng was tendered and accepted as an expert in the field of social work. Meng was first acquainted with John Hall on May 9, 1991, after the court ordered family therapy. Meng referred Hall to Dr. Jim Herzog for individual therapy and also treated John, Ruth Ann and D.K.L. Meng saw John Hall on six occasions; during one individual session on May 9, two sessions with Ruth Ann and John on May 30th and June 21st, and with D.K.L., Ruth Ann and John during three family therapy sessions on July 23rd, July 26th and July 29th. The purpose of the family group sessions was to identify stress areas and work on problem-solving techniques.
Ultimately, Meng testified that John Hall should not be prohibited from seeing D.K.L. as they both wished to hold the family together. Meng further stated that it was in D.K.L.'s best interest to have her family reunited and suggested that Hall remain in couple therapy with Ruth Ann and that D.K.L. be involved on a periodic basis.
Meng could not answer whether the abuse would recur but stated that John Hall had reassured D.K.L. that it would not happen again. When she was questioned about the "no-contact" order, Meng responded that keeping the three apart and separated would not be beneficial at that point. She relayed that Ruth Ann worked the second shift at the hospital and John worked from 8:00-5:00. Meng stated that this arrangement "means that D.K.L. will probably not be in that home a good deal of the time, because she will not be there when John Hall is there by herself." There was no discussion of who would be present in the home in the event Ruth Ann was at work. Meng also asked D.K.L. what she would do in the event that she was sexually abused again. D.K.L. responded, stating that she would tell her mother.
*187 Brenda Chance was accepted as an expert in the field of clinical child therapy. Chance first came in contact with D.K.L. on January 4, 1990. D.K.L. was referred to Chance by Felicia King (a social worker for Hinds County Welfare Department) because of the problem of suspected sexual abuse. Chance focused on determining what happened and D.K.L.'s ability to function and interact with her mother and her stepfather. Chance counseled D.K.L. approximately 39 times and on one occasion met with D.K.L. and John Hall for a therapeutic session. Chance also met with Ruth Ann Hall, John Hall and D.K.L. on two separate occasions during the summer of 1991. At the first hearing, Chance described D.K.L.'s current state as being stronger, capable of being assertive with her stepfather and more her own person. She did state that the child continued to be in a lot of conflict which would continue for some time. Chance also described the relationship between D.K.L. and her stepfather as follows: "[s]he's very anxious for him to be very proud of her ... I see her as being very comfortable with him and I see him as being for her, someone that can fill a vacancy for a father that she does not have and I see him as being capable of providing that without being a threat to her."
Chance recalled the session during which D.K.L. confronted her stepfather and described it as being initially "awkward." However, Chance stated that D.K.L. later was affectionate and comfortable with John Hall.
Chance testified that it was not in D.K.L.'s best interest to be separated from Hall. Furthermore, she stated that it was detrimental to D.K.L. to continue with the order not allowing contact between D.K.L. and her stepfather. In addition Chance stated that D.K.L. felt excluded and was the one punished by the situation. Chance believed that the child needed the opportunity to reestablish a relationship with John Hall. The situation according to Chance was one of extreme conflict and tension whereby the child was sensitive to all the arguing going on among her mother, stepfather, natural father and paternal grandparents.
Chance also testified that certain precautions would be in place in order to prevent a recurrence of abuse. These included a provision that the child not be left alone with John Hall and continued therapy for Ruth Ann, John, as well as for D.K.L. Further, according to Chance, D.K.L. was in the midst of a great deal of conflict within her family and that coping with the situation was a difficult task for the seven year old child. However, Chance opined that D.K.L. did not fear the abuse being repeated and that D.K.L. was comfortable and strong enough to confront and tell someone in the event the abuse was repeated.
Robert J. Brantley, Jr. represented John Hall during the criminal proceedings concerning the gratification of lust charge in Hinds County Circuit Court. Brantley stated that the therapy at that point had been inappropriate and inadequate, and requested alternative therapists be appointed. Brantley further testified that during the period when the hearings were taking place, there was a great deal of family conflict which prompted the court to order family type therapy.
Dianne Curry, employed with the Department of Human Services, prepared a summary of the situation between Ruth Ann Hall and her daughter, D.K.L., and was aware of Ruth Ann's desire to have John return to the home. Curry testified about the Department's recommendations which included: Ruth Ann maintaining the care and custody of D.K.L.; the family continuing counseling with Sue Ann Meng; D.K.L. being allowed to have contact with John Hall under the supervision of an adult. Curry thought that it was not in D.K.L.'s best interest for John Hall to be permitted to return to the home. Curry further stated that she believed Ruth Ann would protect the child from further abuse so that the Department would only need to visit them once or twice a week.
Two reports prepared by Rivers Carpenter, L.C.S.W., and Dr. Holman were admitted and considered by the court. The report dated July 30, 1990, and prepared by Dr. Holman stated in part:
I think that there are a lot of issues that this young child has concerns about that *188 have not been adequately explored in therapy... . [A]lot of what she has gotten out of therapy is reassurance that this won't happen again and that it is not her fault... . She is worried that this could happen again. She doesn't seem to have a good feel for what she should do if it does. With this and the history of changes that occurred prior to the December incident, I am suspicious that there is more abuse that took place than that one time.
I am concerned about the adequacy of the stepfather's therapy. Even Ms. Hall indicates that there are things that can't be dealt with because of pending legal issues. This is certainly not encouraging as far as my being convinced that this problem won't happen again. Deviant sexual behavior of any type is one of the most things there is to treat.
I think that D.K.L. needs to be in regular therapy with someone that can help her work through her own agenda of concerns that she has about this. The mother needs to be in therapy to deal with her own issues of abuse as a teenager and work through some of the denial that I see in relation to her daughter.... Finally, I would strongly recommend that the stepfather be in group therapy that deals with issues of men who sexually abuse children.
The report dated September 4, 1990, and prepared by Rivers Carpenter in part recommended the following:
1) D. be allowed to begin seeing her grandparents again on a regular basis.
2) Emphasis needs to be placed on D.'s understanding the difference between her natural father and her stepfather.
3) D. needs adequate psychotherapy in order to relieve herself of her own involvement, guilt, responsibility for her victimization.
4) It is crucial for someone to begin working with Mrs. Hall on the reality of the situation ... the denial which exists within this woman is tremendous and she seems to have no idea what lies ahead of her in terms of the reconstructive work that would need to occur before her husband could ever be re-unified with this family. The outcome of this situation does not lie within her hands, but instead lies in the hands of the court. Whether this man serves time in the penitentiary or is allowed to go into therapy will depend on other people, which she has little control over.
5) I would caution any individual who has the authority to be able to make decisions on Mr. Hall's future to look very closely and carefully at whatever documents are presented to them outlining facts about his mental health... . The treatment and rehabilitation of a sex offender is a very difficult proposition.
Finally, Mr. Carter, as guardian ad litem for D.K.L., deferred to the therapist's recommendations and stated that he did not have any specific recommendation as to what was in the child's best interest. The court ordered Carter to interview the child and prepare a report for the court to consider. This report is not contained in the record before this Court. In addition, the brief filed by Mr. Carter on behalf of the minor child merely defers to the facts and authority contained in the briefs of Ruth Ann Hall, John Hall and the State of Mississippi. Carter as the guardian for D.K.L., did not have an option to perform or not perform, rather he had an affirmative duty to zealously represent the child's best interest. The record is devoid of any actions on the part of Carter demonstrating such a role.
The court reconvened on Tuesday October 22, 1991, in order to consider the Motion for Reconsideration and/or New Trial. At this second hearing, the attorneys agreed to allow the reports by the Department of Human Services to be considered as part of the record reviewed by the court. In addition, Dianne Curry was recalled to discuss the records and case file on D.K.L. Curry testified that the Department had never recommended that John Hall be returned to the home.

LAW

Standard of Review
The trier of fact at a Youth Court hearing is the Youth Court judge. Miss. Code Ann. § 43-21-105(b); § 43-21-107; § 43-21-203 *189 (1972). This Court's standard of review of Youth Court cases is limited:
[I]n reviewing the evidence we do not proceed de novo. Rather, our scope of review is limited. We consider all of the evidence before the Youth Court in the light most favorable to the State. If the evidence so considered is opposed to the adjudication of the Youth Court with such force that reasonable men could not have found as the Youth Court did beyond a reasonable doubt, we must reverse. See In Interest of K.A.R., 441 So.2d 108, 110 (Miss. 1983). On the other hand, if there is substantial evidence in the record supporting the adjudication of the Youth Court, evidence of such quality and weight that, having in mind the beyond the reasonable doubt burden of proof standard, the Youth Court might reasonably have ruled as it did, we must affirm. Cf. In Interest of I.G., 467 So.2d 920, 924 (Miss. 1985). [Emphasis in original].
In Interest of M.R.L., 488 So.2d 788, 790-91 (Miss. 1986).
As the Youth Court's order stated that D.K.L. was an abused child within the purview of the Youth Court Act, the issues presented turn on whether the evidence before the Youth Court supported the court's decision to dissolve the no-contact order, so as to permit John Hall to be reunited with D.K.L. and the rest of his family.
This Court further explained the role of our Youth Courts in In Interest of D.L.D., 606 So.2d 1125, 1127-28 (Miss. 1992):
The Youth Court division was created as a division of the Chancery Court in counties which do not have county or family courts, and the chancellor presides over such Youth Court proceedings. Miss. Code Ann. § 43-21-107(3) (Supp. 1991). Furthermore, the Youth Court has exclusive original jurisdiction in all proceedings concerning an abused child, and that jurisdiction continues until the child's twentieth birthday. Miss. Code Ann. § 43-21-151(1)-(2). Even though the Youth Court is a "subsidiary" of the Chancery Court, it specializes in abuse and neglect matters, in which it was granted exclusive jurisdiction. The use of the word "full" in defining the jurisdiction of the Chancery Court seems to be inclusive, while the language in the Youth Court statute is explicitly exclusive.
In Interest of D.L.D., 606 So.2d 1125, 1127-28 (Miss. 1992).
However, the Mississippi Legislature reacted to this Court's decision in D.L.D. by modifying § 43-21-151(1)-(2), and clarifying the jurisdictional boundaries for this State's chancery and Youth Courts. The statute as it now reads states in relevant part:
The youth court shall have exclusive original jurisdiction in all proceedings concerning a delinquent child, a child in need of supervision, an abused child or a dependant child except in the following circumstances:
(c) When a charge of abuse of a child first arises in the course of a custody action between the parents of the child already pending in the chancery court and no notice of such abuse was provided prior to such chancery proceedings, the chancery court may proceed with the investigation, hearing and determination of the custody issue as between the parents, notwithstanding the provisions of the Youth Court Law. The proceedings in chancery court on the abuse charge shall be confidential in the same manner as provided in youth court proceedings.
§ 43-21-151(1)(c) (Supp. 1994).
Therefore, in certain situations where the Chancery Court properly has jurisdiction, that jurisdiction is not subordinate to that of the Youth Court.
"In a sense our Youth Courts are neither superior, equal to, or inferior to other `inferior' courts  they are special courts due to the special nature of their function... . The social imperative for prompt disposition of matters affecting children is sufficiently within the police power ... that the legislature may streamline the appellate process as it has done in the present act." In Interest of T.L.C., 566 So.2d 691, 696-97 (Miss. 1990).

I. DID THE LOWER COURT COMMIT MANIFEST ERROR IN FINDING THAT D.K.L. SHOULD REMAIN IN HER MOTHER'S CUSTODY AND *190 ALLOWING JOHN WILLIAM HALL TO RETURN TO THE HOME?
In cases involving neglected or abused children, the Youth Court, in issuing its orders, in part relies on the dispositional alternatives set forth in § 43-21-609 of Mississippi Code Annotated. These options include:
(b) place the child in the custody of his parents, a relative or other person subject to any conditions and limitations as the court may prescribe;
(c) order terms of treatment calculated to assist the child and the child's parent, guardian or custodian which are within the ability of the parent, guardian or custodian to perform;
(d) order youth court personnel, the department of public welfare or child care agencies to assist the child and the child's parent, guardian or custodian to secure social or medical services to provide proper supervision and care of the child; ...
Miss. Code Ann. § 43-21-609 (1972); See also In Interest of T.T., 427 So.2d 1382 (Miss. 1983) (experts testified in Youth Court proceedings on whether child should be returned to natural parents).
The trial judge in the case sub judice after hearing and considering all of the therapist's and case worker's testimony was of the opinion that it was in the best interest of D.K.L. to be reunited with her family and thus permitted John Hall to return to the home.
At the hearing, there was an abundance of testimony by all the treating therapists. While Dr. Stanley, Brenda Chance and Sue Ann Meng opined that it was in the best interest for D.K.L. to reestablish her relationship with John Hall, Rivers Carpenter, Dr. Holman and Dianne Curry expressed reservations about the family being reunited without additional therapy for the family.
Upon examination of the record, it is apparent that the order entered previously by the Circuit Court remains intact and still prohibits John Hall from being alone "with the female child under the age of fourteen without other adult presence and supervision." However, the evidence developed at the hearings demonstrates that Ruth Ann, a nurse, worked the "second shift" at the hospital and that John Hall worked from 8:00-5:00. Of even greater significance is the fact that the experts and interested parties failed to present any evidence or type of strategy to assure the court that D.K.L. would not be alone and unsupervised while in the presence of John Hall. In addition, the Department of Human Services was only required to supervise for a period of 90 days. Based on these facts, and the matters discussed later in this opinion, we believe that while the subsequent order issued by the Youth Court does not per se violate the earlier order entered by the Circuit Court, it does circumvent it. It is clear however, that until the Circuit Court modifies or withdraws its earlier order, Hall must abide by such order. This order specifically states that Hall's failure to abide by the conditions set forth in the order renders the withholding of adjudication of his guilty plea a nullity. Upon notice of failure to abide by the conditions, the Court can proceed with adjudicating his guilt as to the gratification of lust charge. Surely the Youth Court does not intend to permit avoidance of an order issued by the Circuit Court, and surely it cannot do so.
In the present case, it is clear that John Hall underwent therapy. However, there is conflicting testimony by the therapists as to whether Hall received sufficient and adequate treatment so as to adequately support the Youth Court's actions.

II. DID THE LOWER COURT COMMIT MANIFEST ERROR BY FAILING TO APPOINT AN INDEPENDENT THERAPIST TO EVALUATE D.K.L.?
There were several therapists involved in the evaluation of D.K.L. and John Hall. Loggans assigns as error the failure of the Youth Court to appoint a separate therapist to evaluate D.K.L. Loggans cites M.R.E 706(a), which states that "the court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, ... [t]he court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection." Loggans cites no authority wherein *191 Youth Courts have utilized this Rule of Evidence and the brief submitted by the State of Mississippi points to the fact that the Youth Court Act does not expressly provide for the appointment of an independent therapist.
In the present case, Brenda Chance primarily treated D.K.L. and only met with the entire family on three occasions. From the record, it is readily apparent that several therapists were involved in this case. The Circuit Court order required that D.K.L. be provided therapy "by a competent professional." D.K.L. was treated by an expert and a guardian ad litem was appointed. The guardian ad litem did not perform as required in such an important role. This failure on the part of the guardian ad litem to fully represent this child's interest necessitates remanding so that someone with only D.K.L.'s best interest in mind can evaluate the family situation. Therefore, we strongly recommend to the Youth Court that a new and independent expert be appointed to evaluate the present familial relationships. An expert, not connected with or employed by either party, an expert for the court, the child and the record will be in a position to fully assess the relationships as they pertain to the health, safety and well-being of D.K.L.
It should be stressed that this additional appointment could possibly have been avoided save for the fact that the guardian ad litem failed to fully represent D.K.L. as illustrated by his on the record statements and submitted brief. Because the guardian ad litem in essence failed to act on behalf of the minor child, this Court must act by remanding the case.
Finally, we are compelled to note that the State of Mississippi, by and through the Department of Human Services, in effect carried the burden of proof and prosecution of Ruth Ann and John Hall's cause. The Halls simply adopted the briefs submitted by the State. The State should not carry the parties' prosecution of their cause but should at all times safeguard what is in the best interest for D.K.L.
As this case requires reversal based on the issues heretofore discussed, discussion of the remaining issue is unnecessary.

V. CONCLUSION
The record in the present case reflects that there was conflicting expert testimony pertaining to what action is in the best interest of D.K.L. Nonetheless, it is clear that no evidence was presented as to who would be present in the home to supervise the minor child in the event Ruth Ann was not at home. It is the position of this Court, that specific findings need to be made pertaining to the future safety and welfare of D.K.L.D.K.L. is well below the age of fourteen and the stability of her home and family relationships remain in question.
The Youth Court in dissolving its earlier no-contact order, predicated Hall's return on the earlier Circuit Court order which conditions acceptance of Hall's guilty plea on his not being alone with D.K.L. as long as she is under the age of fourteen (14). This order currently remains in effect. In essence, the order of the Circuit Court conditioned Hall's guilty plea on his not being in the presence of D.K.L. without supervision or the presence of another adult. No plan or suggestion was presented to assure compliance with the Circuit Court order. Based on the record in its entirety, it does not appear that the guardian ad litem fully represented D.K.L.'s interest. In addition, the very parties who carry the burden of protecting the interests of this minor child, namely the Department of Human Services and State of Mississippi, seemingly prosecuted this cause on behalf of Ruth Ann and John Hall. Furthermore, the briefs submitted to this Court by the State and guardian ad litem, do little more than merely acknowledge and adopt the contents of the briefs submitted by Ruth Ann Hall and John Hall.
Based on the foregoing, we find the evidence is insufficient to support the Youth Court's actions of dissolving the no-contact order previously in place to prohibit John Hall from being in the same home as his step-daughter D.K.L. Finally, because of the bitter controversy among these family members, the Youth Court on remand should not dissolve the no-contact order without first appointing an independent therapist to *192 fully develop and evaluate the family situation.
REVERSED AND REMANDED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion joined by BANKS, J.
DAN M. LEE, Presiding Justice, dissenting:
While no doubt with the best intentions, today's majority steps outside the bounds of proper appellate review to prevent the reuniting of a family, despite the opinions of learned experts and the judgment of an experienced Youth Court judge that the best interests of D.K.L. require such a reunion. The thinly-veiled assumption underlying the majority's decision is that no expert or lower court can divine the best interests of a child as well as this Court can. Laying aside this assumption, I cannot join an opinion that rejects established standards of review and mischaracterizes evidence. Accordingly, I dissent. Based on the substantial evidence in the record in support of the Order of the Youth Court Judge, I would affirm.
In addressing the standard of review for this case, the majority uses phrases such as "in the light most favorable to the State" and "beyond a reasonable doubt." This language originated in cases involving youth court adjudications of neglect or criminal charges against minors. In these types of situations, the standard of review quoted by the majority is appropriate:
In the recent decision of In the Interest of T.L.C., 566 So.2d 691 (Miss. 1990), this Court stated the standard of review when a party challenges the sufficiency of the evidence supporting an adjudicatory or disposition order. That standard provides:
When a Youth Court makes an adjudication of neglect, this Court considers all the evidence before the Youth Court in the light most favorable to the State. In the Interest of M.R.L., 488 So.2d 788, 791 (Miss. 1986). If the evidence so considered is opposed to the finding of the Youth Court with such force that "reasonable men" could not have found as the Youth Court did by a preponderance of the evidence, this Court must reverse.

In the Interest of T.L.C., 566 So.2d [691] at 701 (quoting Collins v. Lowndes County Public Welfare Dept., 555 So.2d 71, 72 (Miss. 1989)).
In the Interest of C.R., 604 So.2d 1079 (Miss. 1992) (emphasis added).
In cases such as the one sub judice, where a youth court is called upon to make a factual determination as to whether dissolution of a no-contact order is in the child's best interest, the proper standard must be whether or not the decision is manifestly erroneous, i.e. not supported by substantial evidence:
The youth court as trier of fact, was presented with conflicting testimony. Ordinarily this Court will not reverse a trier of fact unless it can be said with confidence that the factfinder was manifestly wrong. Here the finder of fact was confronted with nothing more than the conflicting testimony of the opposing parties and their relatives, and therefore we cannot conclude with confidence that the youth court judge was manifestly wrong as the credibility of witnesses is a matter ordinarily for the trier of fact to determine.
In the Interest of I.G., 467 So.2d 920 (Miss. 1985).
The majority's review of the testimony is amply sufficient to negate the possibility of manifest error in this case. I offer a few additional comments on the testimony only to emphasize the great weight of the evidence that supported the lower court's ruling.
The lower court's ruling was supported by the testimony of Charlton Stanley, a forensic psychologist who conducted a battery of psychological tests on John Hall. In addition to these tests, Stanley conducted a total of twenty-one formal therapy sessions and numerous informal discussions with Hall.
Dr. Stanley testified that after examining hundreds of sex offenders, he was comfortable with his ability to identify deviants by the characteristics they exhibit during testing and therapy. Drawing on this expertise, *193 Stanley determined that John Hall does not have a proclivity to be a sex offender. Specifically, the psychologist stated, "I didn't pick up any deviancies. I picked up some pathology, obviously related to alcohol; but I didn't pick up any sexual deviancy at all." The bases for this conclusion were summarized as follows:
Q. Dr. Stanley, in response to one of Ms. Gault's questions regarding whether or not you found any indication that John Hall was a pedophile, I believe you said you looked to Scale 4 of the MMPI?
A. Yes.
Q. Did you find any indication with your examination and testing, interpretation of data on Scale 4?
A. Scale 4 was completely within normal limits for the general population.
Q. I believe you said you also looked to Scale 9 of the MMPI?
A. I did.
Q. And did you find any indication on that scale?
A. It was completely within normal limits for the non-pathological general population.
Q. And I believe you said you also looked at Cards 2, 6, 7, and 9 of the Rorschach?
A. Yes.
Q. Did you find any indication on those?
A. No.
Q. You looked for content pathology?
A. Yes.
Q. Did you find any indication of content pathology that would lead you to believe this man was a pedophile?
A. No.
Q. With regard to clues on your interviews, I believe you said you looked for lack of insight on the effects to the victim and a lack of empathy with the child?
A. I looked for those, yes.
Q. Did you find any indication of those?
A. Just none, zip.
Q. Does Mr. Hall 
A. In fact, I found him to be empathic with the child. He was concerned about her, you know, whatever impact this would have on her.
Q. How many sessions did you have that were not unofficial sessions, but were sessions that you sat down with John Hall? How many times did you meet with him in counseling sessions?
A. I have 21 sessions with him logged.
Finally, although hearsay, Stanley testified that his findings were substantiated by Jim Herzog, a local psychologist who administered similar independent test (without the benefit of Stanley's opinion) and reached an identical conclusion. Dr. Stanley had the following to say about the dissolution of the no-contact order:
Q. Now, do you have an opinion at this point as to whether or not there exists presently any reason to continue an order of no contact between Mr. Hall and his stepdaughter?
A. I can see no reason at all. In fact, I can see a lot of reasons that he be allowed to see his stepdaughter; but I can't see any reason why he can't.
Q. With regard to reasons that you perceive that he should be allowed to come in contact with his stepdaughter, if you would, explain those to the Court.
A. Well, one, he misses his family. He's got a new baby. He's  he loves his wife. She loves him. Whatever was going on in his life a year and a half ago, I am absolutely, firmly convinced that it was alcohol and nothing else. I can see him cleaning up his act. I don't know if he's going to fall off the wagon. He doesn't know if he's going to fall off the wagon. The child is a lot bigger now. That is, D. is a lot bigger than she was a year and a half [ago]. She would be, obviously, if anything untoward went on, she's in a much better position to report it than she was even a year and a half ago; and the bottom line is D. loves her stepfather. She draws pictures of him and talks about  you know, I see her when she comes in the office; and she will give me a high-five; and I'll ask her how things are going. She wants her stepfather to come home. She doesn't understand why he isn't at home.
*194 The testimony of Dr. Stanley supports the ruling of the lower court. The majority dismisses this important evidence as "inconclusive," and lacking in "concern for the safety of D.K.L." The majority's comments on the testimony are not correct. In the first place, Stanley testified extensively that, in his opinion, John Hall posed no threat to his stepdaughter. Secondly, Stanley made the following statements at the hearing:
I think I'm here to give testimony on behalf of the truth. I'm not particularly an advocate of John Hall, any more than I am of Ruth Ann Hall. I would see myself on  more on the side of D. than any other single individual.
.....
Look, D. is a sweet little girl. She gives me a high-five or a hug every time I see her. She is a dynamite person; and I guess I would be as protective of D. as I would of any other little girl that age or little boys, for that matter. I would not do anything against her best interest. I don't care if John Hall was my brother, let alone my patient. That would have nothing to do with it.
Given Dr. Stanley's repeated iterations of his opinions, and his evident concern for this particular child, I cannot fathom the majority's characterizations of his testimony. If the majority has some other problem with Stanley's objectivity or expertise, I would simply point out that the trial judge was in a much better position to gauge the depth of this witness' knowledge and conviction.
The majority presents accurately, if not fully, the testimony of Sue Ann Meng, a clinical social worker. Ms. Meng did testify, as noted by the majority, that, in her opinion, contact between D.K.L. and John Hall should not be prevented. With respect to D.K.L.'s best interests, Meng stated, "I think it would be in this child's best interest to have her family reunited." Furthermore, though not included in the majority's recapitulation of the testimony, Meng testified that she believed John Hall would continue to comply with the order of the Circuit Court requiring that Hall not be alone with a female child under the age of 14 years.
Judy Chance, an expert in clinical child therapy, was the final witness called in support of dissolving the no-contact order. Chance conducted counseling sessions with D.K.L. on thirty-nine separate occasions. Her opinion was that D.K.L.'s best interest would be served by allowing John Hall to resume living with his family. Specifically, Chance testified as follows:
Q. At this point, do you have an opinion as to whether or not it is the best interest of D. to continue an order which does not allow her to have contact with John Hall?
A. I do not agree with that. I do not think that that is in her best interest at this time.
Q. Why?
A. Because we have a man who is willing to take responsibility for the action, in the first place. I can talk to her, you can talk to her. No one can take away the responsibility for this or the shame or blame, as he can; and he's willing to do that; and, as I said, there's a vacancy for a father, anyway and  and he can fill that void. I think he has the qualities to fill that gap and she needs it. I think she needs the opportunity to  to reestablish a relationship with him, which, from what I can gather, the overwhelming percentage of that was good, was positive, was healthy.
Q. Do you have an opinion as to whether or not continuing a no-contact order at this point would be detrimental to D.?
A. In my opinion, yes. I think she feels like she's the one that  that's suffering. The baby  the baby  the new baby that's entered the family is  is part of this union; and  and it's able to see the daddy, his daddy. There's a relationship between the mother and  and her husband, John Hall. She's the one that's excluded. So, in my opinion, she's the one  she's the one who's being punished by all of this, and she feels responsible. She's been begging for at least a year for him to please come home, to please be able to see him.
Against this array of expert testimony from psychologists and child therapists, the respondents presented only the testimony of *195 Dianne Curry, a social worker, and two reports from individuals who evaluated D.K.L. almost a year prior to the hearing.
As for Curry, the majority represents her testimony as follows, "Curry thought that it was not in D.K.L.'s best interest for John Hall to be permitted to return to the home." Reference to the trial transcript, however, throws considerable doubt on the majority's characterization of Curry's testimony:
Q. Do you have an opinion whether or not it would be in D.'s best interest for John Hall to return to the home at this time?
A. No.
My understanding of this response is that Curry merely declined to express an opinion. My interpretation is further supported by the following response to a later question:
Q. Ms. Curry, you heard the testimony of Ms. Meng and Ms. Chance, is that correct?
A. Yes, I heard that.
Q. Do you respect their opinions?
A. (PAUSE) Well, I don't have an opinion right now about that. Okay?
Upon reviewing Curry's testimony as a whole and in the context in which it was spoken, I cannot conclude, as the majority does, that this social worker "opined that it was not in D.K.L.'s best interest for John Hall to be permitted to return to the home." I believe she simply avoided taking a position on the issue.
The only remaining evidence offered in opposition to the ruling of the lower court were the reports of Dr. Holman and Rivers Carpenter. These reports speak for themselves and are quoted in the majority opinion. Both predated the extensive therapy sessions participated in by both John Hall and D.K.L., and have little, if any, bearing on whether dissolving the no-contact order was in the child's best interest at the time of the hearing. They are totally devoid of any specifics but focus in general terms on the difficulties of successfully treating sexual deviants. From the record, it is impossible to ascertain if either of these individuals ever had any contact with John Hall or access to the results of his psychological testing and treatment. After analyzing the evidence on both sides, I am at a loss to understand how the majority can hold that the youth court's ruling was manifestly erroneous. Accordingly, I would affirm.
My final observation on the majority's opinion is that it seems overly preoccupied with the Circuit Court order resulting from John Hall's criminal prosecution. The sole issue before the Youth Court was whether dissolving a previously entered no-contact order was in the best interest of D.K.L. The majority assumes a multitude of facts outside the record and extraneous to the single issue when it concludes that, "It appears that the current options either allow this seven-year old child to at times be alone in the presence of John Hall or if Hall leaves the home during the time when Ruth Ann is working, the child would be alone and totally unsupervised."
I find it disturbing that a majority of this Court is willing to presume that two sui juris residents of this State will be unable or unwilling to devise a solution whereby Hall could return home and still comply with the circuit court order. If I were inclined to engage in such rank speculation, I would find it more likely that whatever arrangements that allowed Ruth Ann Hall to work the second shift without leaving her child with John Hall, prior to the lower court's order, could continue after the reunion of the family. Also, people have been known to change shifts or even jobs to meet family or legal obligations.

CONCLUSION
The lower court resolved the conflicting evidence on the best interest of D.K.L. in favor of dissolving the no-contact order. Our role is to determine whether this resolution was manifestly erroneous. In light of the great weight of the evidence supporting the youth court's decision, this Court should affirm. It is not our place to extrapolate from the facts in the record in order to justify substituting our judgment for that of the lower court. Accordingly, I would affirm.
>BANKS, J., joins this opinion.