# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01194-COA

IN THE INTEREST OF KEVIN, A MINOR:                    **APPELLANT**
SHAYLA TAYLOR

**v.**

MISSISSIPPI DEPARTMENT OF CHILD                        **APPELLEE**
PROTECTION SERVICES

| | |
|---|---|
| DATE OF JUDGMENT: | 09/25/2020 |
| TRIAL JUDGE: | HON. BRAD ASHLEY TOUCHSTONE |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY YOUTH COURT |
| ATTORNEY FOR APPELLANT: | CHARLES E. LAWRENCE JR. |
| ATTORNEY FOR APPELLEE: | JOSEPH PARKER |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 06/14/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., LAWRENCE AND McCARTY, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1. Shayla Taylor appeals the Lamar County Youth Court's decision to award durable legal custody of her son Kevin[1] to his paternal grandparents. Specifically, she claims that the youth court failed to comply with certain statutory requirements for an adjudication hearing and that the youth court erroneously bypassed reunification. Finding no reversible error, we affirm the youth court's judgment.

## FACTS

¶2. Taylor had two children at the time of this appeal—Kevin, born in 2015, and John,

---

[1] Pseudonyms are used to protect the children's identities.

born in 2020. On March 17, 2020, Taylor got into an argument with John's father, Jakahius

Clark, who was living in Texas at the time. After their argument, Taylor sent Clark a video

of her "brushing" a butcher knife against John's leg.[2] At the time of this incident, Kevin was

four years old, and John was two months old. Clark immediately booked a flight to

Mississippi to retrieve his son, John. According to Clark, when he arrived, he showed the

video to Taylor's parents, and they said they would take Taylor to the hospital to be admitted.

Taylor was reportedly "laughing the whole time" during Clark's conversation with her

parents. The following day, Clark reported the incident to the Mississippi Department of

Child Protection Services (CPS) and informed CPS that Taylor had previously sent him

messages threatening to kill herself and their son. CPS removed John from Taylor's home

based on Clark's report.[3]

¶3.     On March 19, 2020, the youth court held a shelter hearing regarding John, who was

alleged to be an "abused child" under Mississippi Code Annotated section 43-21-105(m)

(Supp. 2019).[4] At John's shelter hearing on March 19, 2020, CPS learned of Taylor's other

---

[2] The video was never introduced as an exhibit during any of Kevin's youth court proceedings. However, Taylor admitted to both the Mississippi Department of Child Protection Services and the youth court that she "brushed" the knife against John's leg and sent the video to Clark. The record is silent as to whether Kevin was present when Taylor "brushed" the knife against John's leg.

[3] The record on appeal does not contain all the youth court's separate orders or hearing transcripts regarding John, presumably because Taylor only appeals the youth court's custody award regarding Kevin. As a result, the facts of this case will primarily focus on Kevin and what occurred during his proceedings.

[4] Subsection (m) defines an abused child as "a child whose parent . . . has caused or allowed to be caused, upon the child, sexual abuse, sexual exploitation, commercial sexual exploitation, emotional abuse, mental injury, nonaccidental physical injury or other

2

child Kevin, who was still in the home. CPS took Kevin into custody on March 25, 2020. The youth court held Kevin's shelter hearing the following day. At the hearing, CPS informed the court that it had placed Kevin with his paternal grandparents, Shawn Hosey and Stephanie Hosey, and that the Hoseys had agreed to be a licensed resource home. Taylor's attorney informed the court that Taylor was currently in an inpatient mental-health facility. When the court asked the guardian ad litem (GAL)[5] her opinion on whether an emergency custody order was appropriate, she responded, "Absolutely, your honor. The video [is] very disturbing . . . . I think it's better to be safe in this situation to ensure the child's safety."

¶4. On March 30, 2020, the court issued an emergency custody order removing physical and legal custody from Taylor and Robert Pittman, Kevin's father.[6] The order acknowledged that Kevin was alleged to be an abused child under Mississippi Code Annotated section 43-21-105(m). In removing custody, the court reasoned that keeping Kevin in Taylor's home "would be contrary to [his] welfare" because "the home environment or the people [in his home] pose an immediate danger." That same day, the court also issued a shelter order stating that Kevin was removed from the home because he was "endangered" or "would be endangered." The court further found that good and sufficient cause existed for CPS to retain custody of Kevin. Finally, the court ordered that reasonable efforts be made toward

maltreatment . . . ." Miss. Code Ann. § 43-21-105(m).

[5] Uniform Rule of Youth Court Practice 13(a)(5) requires the youth court to appoint a GAL "in every case involving an abused or neglected child which results in a judicial proceeding."

[6] Pittman was incarcerated at the time of the hearing.

reunification of Kevin with his family.

¶5.     On April 1, 2020, Lamar County filed a petition alleging that Kevin was an emotionally abused child for purposes of section 43-21-105(m) of Mississippi's Youth Court Law. *See* Miss. Code Ann. § 43-21-101 (Rev. 2015). As a result, the County requested that the youth court hold a hearing to determine Kevin's best interest and welfare. On May 5, 2020, the youth court held an adjudication hearing for both children. Taylor and Clark, John's father, and their attorneys were present. After informing both parents of their right to contest adjudication, both parents informed the court they were not contesting adjudication of either child. Based on the "lack of contest," the youth court adjudicated both children as abused within the meaning of the Youth Court Law and issued an order to that effect.

¶6.     That same day, the court held a disposition hearing for both children. CPS informed the court that Kevin was doing well in his placement home with his paternal grandparents. According to CPS, Taylor reported that she received treatment in a mental health facility for twelve days after the incident in March 2020. At the time of the disposition hearing, Taylor was reportedly "maintaining" her mental health treatment at another facility and taking prescribed medications for depression. CPS also reported that Taylor was being financially supported by her mother while attending nursing school. Based on Taylor's progress, CPS requested that Taylor be allowed supervised visitation with both children.[7] Ultimately, CPS recommended a permanent plan of reunification between Kevin and his mother. When the court asked the GAL her opinion on reunification, she responded, "[T]hat makes me very

---

[7] Until this point, Taylor had no contact with either child.

nervous, Judge . . . . I mean, [Kevin] seems to be content with the paternal grandmother." The court acknowledged the GAL's concerns and noted that "the law . . . requires this Court to bypass reasonable efforts to reunite a parent that has subjected a child to abuse or torture." At the close of the hearing, the court stated that it had "considered all the evidence and relevant factors." Ultimately, the court elected to bypass reunification between Taylor and both of her children. The court also ordered a permanent plan of durable legal custody for Kevin. Taylor's attorney objected to the court's decision, arguing that Taylor had sought mental health treatment immediately following the incident; counsel further indicated that Taylor may have suffered from postpartum depression. Taylor's attorney also argued that "this was an isolated incident based on a health concern she had." The court noted the objection and stated, "If I have additional information from an expert or somebody down the road that suggests . . . Taylor does not pose a threat of harm to [Kevin], I may reconsider the permanency plan." On May 14, 2020, the court entered a disposition order consistent with its bench ruling.

¶7.     On June 15, 2020, the court entered an order of placement, granting Stephanie Hosey, Kevin's paternal grandmother, "physical placement." On June 23, 2020, the court held a permanency hearing for both children to determine if any changes needed to be made. CPS informed the court that Kevin was still living with Hosey and that Hosey had agreed to accept durable legal custody of Kevin. CPS reported that Kevin had a close bond with her. Additionally, CPS informed the court that Taylor had been participating in visitation with both children through video conferences. Taylor's attorney again requested that the court

reconsider its decision to bypass reunification, and the court noted the request. At the close of the hearing, the judge stated that it gave him "no pleasure to remove a child from its mother, but this is one of those cases where I have to do what I think is best for the children and keep them safe and to remove any potential threats for their safety." The court recognized that Kevin had a "strong bond" with his paternal grandmother and that remaining with her was "a safe alternative" and in Kevin's best interest. Thus, the court ruled to keep the current permanency plan in place. Following the hearing, the court entered a permanency order, which ordered CPS to finalize a durable legal custody or legal guardianship permanency plan for Kevin. The court also stated it would conduct a status hearing in ninety days.

¶8. On September 22, 2020, the court held another permanency hearing. CPS informed the court that Kevin was still living with his paternal grandparents and was up to date on all his medical needs. CPS reported that Kevin had started daycare on August 17, 2020. Additionally, CPS stated that "there is no concern or safety concerns with either child." On June 30, 2020, Taylor informed CPS that she wanted to "postpone the visits with her kids until further notice." According to CPS, CPS asked Taylor if she was "sure" about her decision, and she stated that she "was positive." When the court asked why, CPS responded, "Well, she's stated it's due to conflict and a lot of drama that was going on. I know she has school as well." At the close of the hearing, CPS and the GAL recommended that the court grant Kevin's paternal grandparents durable legal custody of Kevin. On September 25, 2020, the youth court entered an order awarding Kevin's paternal grandparents durable legal

6

custody.  Taylor appealed.

**STANDARD OF REVIEW**

¶9.     Our standard of review in youth court cases is limited.  *In re D.K.L.*, 652 So. 2d 184, 189 (Miss. 1995).  The youth court judge sits as the trier of fact.  *Id.*  When challenging a youth court's adjudicatory or dispositional order regarding sufficiency of the evidence, the standard of review is a preponderance of the evidence.  *In re C.R.*, 604 So. 2d 1079, 1083 (Miss. 1992).  In addition, the appellate court "considers all the evidence before the youth court in the light most favorable to the State."  *Id.*  "If the evidence is such that, beyond a reasonable doubt, reasonable minds could not have reached the youth court's conclusion, we must reverse.  However, if the evidence in the record supports the youth court's adjudication, considering the reasonable-doubt standard, then we must affirm."  *S.M.K.S. v. Youth Ct. of Union Cnty.*, 155 So. 3d 876, 878-89 (¶8) (Miss. Ct. App. 2014) (quoting *In re L.C.A.*, 938 So. 2d 300, 303 (¶6) (Miss. Ct. App. 2006)).

**ANALYSIS**

1.      **Whether the Youth Court Complied with Mississippi Code Annotated section 43-21-557.**

¶10.    Taylor first argues that the youth court failed to comply with Mississippi Code Annotated section 43-21-557 (Rev. 2015), which sets forth the rules and requirements for adjudication proceedings.  Specifically, Taylor claims that the youth court failed to comply with section 43-21-557(1)(c) and (e), which reads:

> At the beginning of each adjudicatory hearing, the youth court shall:
>
> . . . .

(c) ascertain whether the notice requirements have been complied with and, if not, whether the affected parties intelligently waived compliance in accordance with Section 43-21-507; [and]

. . . .

(e) explain to the parties:

> (i) the right to counsel;
> (ii) the right to remain silent;
> (iii) the right to subpoena witnesses;
> (iv) the right to cross-examine witnesses testifying against him; and
> (v) the right to appeal.

¶11. There is no indication in the record that the youth court ascertained whether notice requirements for Taylor had been complied with, as required by section 43-21-557(c). However, both Taylor and her attorney were present at the hearing, and Taylor's attorney made no objection concerning service of process. Mississippi Code Annotated section 43-21-507(2) (Rev. 2015) provides that "[a] party other than the child may waive service of summons on [her]self . . . by voluntary appearance at the hearing . . . ." Thus, "[a]ny infirmity in the service was cured by [Taylor's] appearance at the hearing." *See In re J.P.*, 151 So. 3d 204, 210 (¶17) (Miss. 2014) (holding that father's appearance at hearing cured any potential defect regarding section 43-21-557(c)'s notice requirements).

¶12. As for section 43-21-557(e), the record unequivocally shows that the youth court explained Taylor's rights to her. At the beginning of the adjudication hearing, the attorneys informed the court that no parent was contesting either child's adjudication as an abused child for purposes of section 43-21-105(m). The court informed Taylor and Clark that the court was required to inform them of their rights before proceeding. The court then informed

both parents that they had a right to an evidentiary hearing where they would be entitled to put on a full defense. The court further informed both parents that they would have a right to an attorney in that instance and would have the right to remain silent if they did not want to testify. The court notified both parents of their rights to subpoena witnesses, cross-examine witnesses, and appeal. Finally, the court informed both parents that if they did not contest the allegations listed in the petition, the court would "accept those allegations as true, and . . . the children [would] be adjudicated abused." The court then stated, "You've got to answer out loud." Both parents responded, "Yes." Because the youth court clearly complied with section 43-21-557(e), we find Taylor's argument is without merit.

## 2. Whether the Youth Court Erred in Bypassing Reunification.

¶13. Taylor also argues that the youth court erred in bypassing reunification and awarding Kevin's paternal grandparents durable legal custody. More specifically, she claims that "there has been no evidence . . . which supports a finding that [she] harmed, physically or mentally, or posed a threat to [Kevin] which necessitated the court's refusal to return the child to his residence because it would be contrary to the welfare of the child."

¶14. As discussed above, Taylor did not contest adjudication. As a result, the court adjudicated Kevin as an abused child for purposes of Mississippi Code Annotated section 43-21-105(m) and scheduled a disposition hearing for Kevin. At the disposition hearing, the court rejected CPS' recommendation for reunification between Taylor and Kevin. The court based its decision on the GAL's statements during the hearing as well as its own concerns for Kevin's safety:

> As expressed by the [GAL], this court cannot in good conscience [work toward reunification of Kevin with his mother]. These allegations that occurred are serious and did pose a serious threat of harm to these children. This court is not going to second guess itself on the safety and well-being of the children. No parent that subjects a child to that type of threat will be reunited with their parent in this court. Therefore I'm going to order that reasonable efforts to reunite [Kevin] be bypassed with respect to his mother.

In bypassing reunification, the court relied on Mississippi Code Annotated section 43-21-603(7)(c)(iv) (Supp. 2016), which states:

> (7) If the youth court orders that the custody or supervision of **a child who has been adjudicated abused** or neglected be placed with the Department of Human Services or any other person or public or private agency, other than the child's parent, guardian or custodian, the youth court shall find and the disposition order shall recite that:
>
> . . . .
>
> (c) Reasonable efforts to maintain the child within his home **shall not be required** if the court determines that:
>
> . . . .
>
> (iv) **That the effect of the continuation of the child's residence within his own home would be contrary to the welfare of the child** and that placement of the child in foster care is in the best interests of the child.

(Emphasis added).

¶15. At the second permanency hearing, the youth court determined that it would be in Kevin's best interest to award his paternal grandparents durable legal custody. The final permanency order did not specify any visitation for Taylor, presumably because she wanted to "postpone" visitation "until further notice." Mississippi Code Annotated section 43-21-105(y) (Supp. 2019) provides the definition of "durable legal custody":

10

> Durable legal custody means the legal status created by a court order which gives the durable legal custodian the responsibilities of physical possession of the child and the duty to provide him with care, nurture, welfare, food, shelter, education and reasonable medical care. All these duties as enumerated are subject to the residual rights and responsibilities of the natural(s) or guardian(s) of the child or children.

"The fact that under durable legal custody the parent retains some form of residual rights and responsibilities is a vital and obvious distinction to termination of parental rights." *In re S.A.M.*, 826 So. 2d 1266, 1279 (¶39) (Miss. 2002). Further, "a decision to grant durable legal custody is not permanent and is, therefore, subject to further review and modification by the courts." *Id*.

¶16. Here, the record shows that Taylor admitted she sent Clark a video of her "brushing" a butcher knife against their two-month-old son's leg. Clark's initial report with CPS claimed that Taylor also had previously sent him messages threatening to kill herself and their son. The GAL testified that the video was "very disturbing." At no point during the disposition hearing or at either of the permanency hearings did the GAL recommend reunification between Kevin and his mother. On the contrary, the GAL testified that reunification made her "very nervous" and instead recommended that Kevin's paternal grandparents be awarded durable legal custody. The youth court apparently agreed with the GAL's concerns, stating that "[t]hese allegations that occurred are serious and did pose a serious threat of harm to these children." Ultimately, the youth court determined that it was in Kevin's best interest that his parental grandparents be awarded durable legal custody. Upon review of the record, we find that the youth court did not err in its determination.

**CONCLUSION**

¶17.   After review of the record, we find no reversible error as to Taylor's arguments regarding Mississippi Code Annotated section 43-21-557.  Further, in applying our limited standard of review, we cannot say the youth court erred in bypassing reunification and awarding durable legal custody to Kevin's paternal grandparents.  Accordingly, we affirm the youth court's judgment.

¶18.   **AFFIRMED.**

   **BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**