658 So.2d 1378 (1995)
In the Interest of R.D. and B.D., Minors.
COPIAH COUNTY DEPARTMENT OF HUMAN SERVICES
v.
LINDA D.
No. 93-CA-00674-SCT.
Supreme Court of Mississippi.
July 20, 1995.
*1379 Michael C. Moore, Atty. Gen., J.D. Woodcock, Sp. Asst. Atty. Gen., Jackson, for appellant.
M. Lamar Arrington, Jr., Hazlehurst, for appellee.
Before PRATHER, P.J., BANKS and SMITH, JJ.
SMITH, Justice, for the Court:
This case comes on appeal to this Court from the Chancery Court (Youth Court Division) of Copiah County, wherein Chancellor Donald B. Patterson, restored custody of two minors, R.D. and B.D., to their natural mother, Linda D.
A petition alleging that the minors were neglected by their natural mother, Linda D., was filed by the Copiah County Department of Human Services in June of 1990. Chancellor Mike Carr adjudicated the minors as neglected, ordered them removed from Linda D. and their custody was placed with the Department of Human Services. Linda D. filed numerous unsuccessful petitions attempting to have the children returned to her custody. On June 3, 1993 an Order Restoring Custody was entered. The Department of Human Services, (DHS), requested that the court reconsider its order. R.D. and B.D., along with their Court Appointed Special Advocate (CASA), Sally Garland, through independent counsel, Jim Kitchens, joined the DHS' motion for reconsideration. The request for reconsideration was denied, prompting the appeal to this Court citing the following issues for review:
I. FAILURE TO APPOINT A GUARDIAN AD LITEM TO REPRESENT THE CHILDREN WAS VIOLATIVE OF DUE PROCESS.
II. THE APPROPRIATE LEGAL STANDARDS WERE NOT APPLIED BY THE TRIAL COURT.
III. THE COURT'S DECISION TO RETURN THE CHILDREN WAS AGAINST OVERWHELMING WEIGHT OF EVIDENCE.
IV. THE TRIAL COURT IMPROPERLY EXCLUDED THE TESTIMONY OF THE CASA WORKER AND *1380 THE DEPARTMENT OF HUMAN SERVICES SOCIAL WORKERS.
All issues presented warrant consideration and discussion. Thorough review indicates issues I, II, and III to be of merit. Issue IV has merit concerning the denied testimony and opinions of social workers. The chancellor was in error in denying their testimony. However, the chancellor was not in error in denying Garland's testimony. We affirm in part and reverse in part and remand to the lower court for reconsideration of the "best interest" of the two minors regarding their physical custody.

STATEMENT OF FACTS
The Chancery Court of Copiah County (Youth Court Division), adjudicated R.D., age 1 year 10 months and B.D., age 6, years as neglected children and removed them from their mother Linda D. and placed custody with DHS in 1990. The children were placed in foster care. Linda D. filed numerous unsuccessful petitions attempting to have custody of the two minors returned to her. Her final and current petition to restore custody was considered by the lower court on May 24, 1993, and the court entered its order restoring custody to Linda D. on June 3, 1993.
DHS submitted to Linda a service agreement for her to comply with prior to their recommendation of returning custody of the children. Linda completed parenting classes and claimed she had done all that was required of her by DHS.
Regarding parenting classes, Linda claimed that she "learned a lot." Linda claimed that she "didn't have no problems before, it just helped me understand my kids more." She said she had never had problems with her parenting skills and had raised kids since she was 11 years old.
Linda did not recall being in court in previous years and having R.D. and B.D. being adjudicated neglected. She stated that Billy Mangold took her children because she was an only parent and because her husband was in Parchman.
Linda stated that her situation and financial dealings had improved in the past year. Asked to explain this, however, she testified: "Everything's the same as it were then." She denied ever having problems as a parent and concluded "there wasn't nothing really to change as a parent."
Linda testified that when she saw R.D. and B.D. with their foster parents, they were scared of her. She admitted not signing a release for the Welfare Department although she had been asked twice to do so. Linda denied DHS had visited her home since the previous May. She also denied hiding in her home when DHS arrived for home visits.
Linda's son, T.L.D. testified that he lived with his mother, was not neglected by his parents and believed his mother did all she could to raise his siblings.
DHS's motion to dismiss for Linda's failure to prove her petition was denied. DHS offered its proof that it was not in the children's best interest that their custody be returned to Linda D. Sara Taylor, DHS social worker, was assigned to the case of R.D. and B.D. since August of 1991. In compliance with the court's order of May 1992, Taylor presented the "service agreement" to Linda, which she agreed to follow. Taylor testified it was impossible to know how Linda was doing because she refused to sign the release allowing mental health information to be provided to DHS. The requirements included parenting classes, visits with the children, which Linda generally kept and home visits, which Taylor had not been able to successfully complete. Taylor's opinion as a social worker, having observed the children in foster care, was that it was currently best for them to remain in foster care due to Linda's lack of progress on portions of the service agreement. She based her opinion on the children's attitude, grade performances and "just how they're doing." Regarding home inspections, Taylor maintained that "these are violent people and I'm not going to keep going there."
Billy Mangold, DHS advanced social worker, testified he was involved in the investigation *1381 that led to R.D. and B.D. being removed from Linda's care. He made efforts to have Linda's information released from the mental health center, but Linda would not sign the authorization. A decision was then made to recommend termination of Linda's parental rights. Mangold opined that by Linda's own testimony, "nothing has changed since the last hearing in 1992. She has made no progress whatsoever." Mangold believed it would be detrimental to the children to return them to Linda D. at the time of the trial.
Sally Garland testified she was asked to help DHS with the cases of R.D. and B.D. as a Court Appointed Special Advocate (CASA). She read the case reports, spoke with the foster parents, DHS and the children. She had not spoken with Linda and was advised against visiting because of "a history of violence in the family." Garland testified she did not represent either DHS or Linda. She reviewed the case for about three months, had "brief" visits with the children and attended the last meeting of the Foster Care Review Board, where she heard Linda's testimony. Garland was trained by the National Association of CASA.
On voir dire, Garland stated she was appointed by the court in October 1992. She explained she was part of a children's advocate program, not DHS. Her only expert opinion is what is best for the children. The court explained to counsel there was no formal appointment or special order appointing Garland as a CASA. Garland's opinion was that the children's best interest would be served if Linda D's rights were terminated and they remained in foster care.
Steve Fisher, mental health counselor, tendered as an expert witness, estimated he worked with Linda on fifteen occasions. Information on Linda was not furnished to DHS because she would not sign a release. Linda D. had been referred to the Mental Health Center by DHS for the purpose of determining whether she was fit to care for her children. Fisher stated that no information was released to DHS because "she didn't want them knowing any information because she was afraid it might be used against her." Linda would not willingly give him the requested information, and did not respond well to counseling.
Fisher saw a problem in Linda's general attitude. Fisher stated that Linda "was unwilling to consider [in] her own way she may have contributed to the problem herself." Fisher could not make a recommendation concerning custody of Linda's children because he had nothing except Linda's statements to go on. Fisher did state that he had misgivings, but gave no specific reason why Linda should be prevented from having custody returned to her.
The court denied DHS's request to have the court interview the children in chambers, finding the children were unable to state a custody preference because that statute was not applicable except as to custody proceedings between parents, and because the children were under the statutory age of twelve required the children to express a preference.
Cindy Kinard, Mental Health Services Center Coordinator, testified that Linda was referred to the center in 1992 by DHS. Kinard could not obtain a case history on Linda because she refused to sign a release. Kinard stated during the in-take interview, Linda "told me that she did not feel like she needed counseling or therapy." Kinard described Linda as "very evasive" and as someone she didn't feel would benefit from therapy because "she didn't want to be there and she didn't feel she had a problem." In Kinard's experience, such persons might listen, but not learn anything.
Kinard recommended against returning custody to Linda because of Linda's attitude and her statements that her other children had been in a "lot of trouble... . at school and with the law." Kinard testified Linda attended parenting classes "sporadically" but did complete all 12 classes.
The lower court returned custody of R.D. and B.D. to Linda. DHS's motion for reconsideration, *1382 joined in by Jim Kitchens, attorney for the minors, R.D. and B.D., was denied after a separate hearing on the matter.

DISCUSSION

I. FAILURE TO APPOINT A GUARDIAN AD LITEM TO REPRESENT THE CHILDREN WAS VIOLATIVE OF DUE PROCESS.
DHS argues that R.D. and B.D. were not appointed a guardian ad litem in violation of Miss. Code Ann. § 43-21-121(1)(e) (1972). That section provides:
(1) The youth court shall appoint a guardian ad litem for the child:
(e) in every case involving an abused or neglected child which results in a judicial proceeding; ... .
Sally Garland testified that Chancellor Patterson appointed her as the children's CASA in October of 1992. Linda's counsel objected to Garland's testimony, stating Garland was not a qualified expert and should not be permitted to testify. Special Assistant Attorney General J.D. Woodcock, representing DHS, responded: "Your honor, I take the position that Mrs. Garland's position is somewhat as a guardian ad litem and she should be allowed to report to the court." Woodcock likened the situation to Garland actually representing the children. However, the chancellor rejected this contention as no order existed in the court file. He stated that although he had established a CASA program in Copiah County, no such appointment was made in this case.
DHS now argues that even having a CASA did not satisfy the statutorily mandated appointment of a guardian ad litem. DHS cites Luttrell v. Kneisly, 427 So.2d 1384, 1388 (Miss. 1983), a case where this Court emphasized that a child shall have a guardian ad litem appointed in actions for the termination of parental rights. Id. at 1388. See, Miss. Code Ann. § 93-15-107 (Supp. 1982).
In Edwards v. State, the appellant sought to estop the State from belatedly attempting to have his children declared "unavailable" to testify at his trial for sexual battery. This Court, interpreting § 43-21-121, examined the role of both the State and the guardian ad litem in dealing with the appellant's children. The Court stated:
Edwards contends in this appeal that the State should have been `estopped from raising the [availability] issue at such late date' because: (1) FP had already testified during the trial in the dissemination case, and (2) the State failed to timely object to the children being called to testify during the trial in the case sub judice.

Edwards' contention is unpersuasive. In this case, the guardian  not the State  was charged with protecting the children's interest. See Miss. Code Ann. § 43-21-121(1)(e) & (2) (1972 as amended) (`The youth court shall appoint a guardian ad litem for the child ... in every case involving an abused or neglected child which results in a judicial proceeding; ... In addition to all other duties required by law, a guardian ad litem shall have the duty to protect the interest of a child for whom he has been appointed.') Therefore, Edwards is wrong to refer to the State and its failure to object.
Id., 594 So.2d 587, at 590 (Miss. 1992) (emphasis in original).
This Court, in Luttrell, made clear that the guardian ad litem is the one primarily charged with and looked to for protection of the children's interest when judicial proceedings arise.
This Court's most recent pronouncement adhering to this established principle is Loggans v. Hall, 652 So.2d 184 (Miss. 1995). In Loggans, the lower court fully complied with the statute and properly appointed a guardian ad litem to represent a minor child adjudicated as sexually abused. The case involved a problem within the family obviously conflicting with and not in the minor's "best interest." This Court, concerned about the representation, or lack thereof, by the guardian ad litem stated:
Finally, Mr. Carter, as guardian ad litem for D.K.L., deferred to the therapist's recommendations *1383 and stated that he did not have any specific recommendation as to what was in the child's best interest. The court ordered Carter to interview the child and prepare a report for the court to consider. This report is not contained in the record before this Court. In addition, the brief filed by Mr. Carter on behalf of the minor child merely defers to the facts and authority contained in the briefs of Ruth Ann Hall, John Hall and the State of Mississippi. Carter as the guardian for D.K.L., did not have an option to perform or not perform, rather he had an affirmative duty to zealously represent the child's best interest. The record is devoid of any actions on the part of Carter demonstrating such a role.
Loggans, 652 So.2d at 188 (emphasis added).
This Court ultimately considered the inadequate role of the guardian ad litem to be so egregious that reversal and remand was required. The Court held:
The guardian ad litem did not perform as required in such an important role. This failure on the part of the guardian ad litem to fully represent this child's interest necessitates remanding so that someone with only D.K.L.'s best interest in mind can evaluate the family situation ... . . It should be stressed that this additional appointment could possibly have been avoided save for the fact that the guardian ad litem failed to fully represent D.K.L. as illustrated by his on the record statements and submitted brief. Because the guardian ad litem in essence failed to act on behalf of the minor child, this Court must act by remanding the case.
Loggans, at 191.
A review of cases from other jurisdictions regarding the importance, purpose and role of the guardian ad litem is noteworthy. In Short v. Short, 730 F. Supp. 1037, 1038 (D.Colo. 1990), the court stated that the guardian ad litem "investigates, makes recommendations to a court, or enters reports," and "hold[s] paramount the child's best interest." In Shainwald v. Shainwald, 302 S.C. 453, 458, 395 S.E.2d 441, 444 (Ct.App. 1990), the court held:
We reject the mother's somewhat novel argument that guardians ad litem should be precluded altogether from giving opinions regarding custody. We think much of the criticism of guardians ad litem stems from the failure of the bar to recognize the proper function of a guardian ad litem. A guardian ad litem is a representative of the court appointed to assist it in properly protecting the interests of an incompetent person. (cites omitted).
... [C]hildren are best served by the presence of a vigorous advocate free to investigate, consult with them at length, marshal evidence, and to subpoena and cross-examine witnesses.
... Judges should also be mindful of the fact that a guardian ad litem is not in the true sense an adversary party and the court has a duty to insure that guardians ad litem perform their duties properly and in the best interest of their wards. The trial judge's duty to assure the child's best interests are protected requires as a minimum that (1) he select a competent person to serve as guardian ad litem; (2) he select a person with no adverse interest to the minor; and (3) the person so selected is adequately instructed on the proper performance of his duties.
Shainwald, at 447.
This Court, having already expressed its concerns about the importance of the role of the guardian ad litem in Luttrell and Loggans, adheres to the same principles established in Shainwald. We therefore adopt these same three requirements as minimum requirements that the judge must adhere to in the appointment of guardians ad litem representing minors before the courts of this state.
In the case at bar, as in Shainwald, we note similar argument of counsel for the mother, objecting to the admission of testimony from CASA and social workers. Dispositional hearings in youth courts are very *1384 informal, allowing for hearsay testimony as well as reports from various individuals or agencies who have information concerning the well being and "best interest" of the minors before the court. Social workers at dispositional hearings should therefore be allowed to give their opinions regarding the "best interest" of minors based upon their investigations and personal observations. Whether to allow testimony is determined by the sound discretion of the chancellor.
On remand, if CASA volunteer Garland is properly appointed as the children's CASA by order of the chancellor, there should be no problem with her being allowed to testify and give an opinion or recommendation at disposition concerning these minors as determined in the sound discretion of the chancellor. Trained, qualified laypersons such as CASA volunteers may be appointed guardian ad litems also if the chancellor deems advisable in his sound discretion.
However, a better method might be for the judge in his sound discretion, to appoint a CASA volunteer to assist the children and also appoint a well qualified and competent attorney as guardian ad litem to represent the minors, thus safeguarding the minors legal rights.
We note also that the record reflects that for approximately three years R.D. and B.D. were without the services of an attorney or guardian ad litem. These minors were denied the due process right of representation set out in Short, Shainwald, and by this Court in Luttrell and Loggans. This oversight of a mandatory requirement was not satisfied until Jim Kitchens appeared on behalf of the minors at the Motion for Reconsideration. Miss. Code Ann. § 43-21-121(1)(e) mandates that the "youth court shall appoint a guardian ad litem" for neglected children involved in judicial proceedings. R.D. and B.D., adjudicated neglected on July 13, 1990 and removed from Linda's custody, were certainly entitled to be appointed a guardian ad litem who would actively represent them in order to protect their "best interests." See Miss. Code Ann. § 43-21-121(2).
The chancellor apparently was under the mistaken impression that when DHS assumes custody of children, DHS undertakes more than a custodial role and actually legally represents children. The issue of representation, although somewhat suggested by DHS to have been satisfied by Sally Garland, the CASA at the May 24th hearing, was totally rejected by the chancellor. Attorney Kitchens raised the issue again on reconsideration, strenuously arguing that the children were entitled to independent counsel:
BY MR. KITCHENS: ... I believe it is raised in the motion in that the children have not had legal counsel up to this point and with that in mind I don't think that their position has been clearly put before the court and that would necessarily involve the court hearing additional evidence from their standpoint.
BY THE COURT: Are you telling me that the children are not represented through the Department of Human Services?
BY MR. KITCHENS: Your Honor, I think they are entitled to have counsel of their own. I don't work for the Department of Human Services, I'm here representing them and the person that this court appointed to represent their interest.
BY THE COURT: Who is that?
BY MR. KITCHENS: That's Sally Garland.
BY THE COURT: There has been no appointment by this Court.
BY MR. KITCHENS: Well, she's characterized in that way in the pleadings, your honor. I have not had the opportunity to see the whole court file or the youth court file, but you characterized that a court appointed person 
BY THE COURT: Let me clarify this matter that came up. This court has implemented the CASA program. The court appointed Sally Garland as the director of that program for the Youth Court of both counties. In addition to Mrs. Garland, who is a trained CASA worker, my recollection *1385 is that there have been two additional CASA workers in this county trained by Mrs. Garland, but no orders were ever entered in these two cases appointing Mrs. Garland or anyone else in any official capacity, so there is no such order.
BY MR. KITCHENS: With that understanding, that's all the more reason, if the children have not heretofore been represented by even a lay person, that they should not be afforded the right to counsel.
The record indicates that after the adjudication of neglect by Chancellor Mike Carr, the various orders continuing the custody of the two children in DHS thereafter were entered by Chancellor Donald Patterson. At no time does the record indicate the children were ever appointed a guardian ad litem as mandated by § 43-21-121(1)(e). Further, Attorney Jim Kitchens did not enter into the case until three years after its inception. B.D. and R.D. were left for all intents and purposes wholly unrepresented in these proceedings. Due process considerations certainly are raised by a process which afforded counsel to the mother and to DHS but not to the children whose very future and "best interests" is at the heart of this controversy.
As this Court held in Luttrell, it is mandatory that a guardian ad litem be appointed for children in actions to terminate parental rights. See Miss. Code Ann. § 93-15-107 (Supp. 1982). The language of § 43-21-121(1)(e) concerning abused and neglected children is no less mandatory.
DHS, as the custodians of the children, could and should have pointed to the need for the appointment of a guardian ad litem for R.D. and B.D. far earlier in these proceedings. There was no excuse for DHS waiting until the end of these proceedings when the court issued an order finally restoring custody of these children to their natural mother to raise this issue. Such delay by DHS was certainly not in these children's best interest.
Either of the two chancellors should also have recognized the mandatory requirement of the statute and appointed R.D. and B.D. a guardian ad litem. Chancellor Patterson commendably had established a CASA program and Sally Garland apparently had been involved with these minor children for three months prior to the May 1993 hearing. The chancellor could have by order officially appointed Garland as a CASA for the children, or alternatively as guardian ad litem, but clearly did not do so. No order existed and the chancellor emphatically stated that no such appointment occurred. This entire process appears to be mere oversight by the chancellors. Nonetheless, the children's due process rights to representation cannot and will not be ignored by this Court. Whether requested or not, judges have the obligation to appoint a guardian ad litem to represent every minor alleged to be abused or neglected as the statute requires.
There is clear support for Attorney Kitchens' position that the children were entitled to independent counsel throughout these proceedings. Miss. Code Ann. § 43-21-201 provides, in relevant part:
(1) Each party shall have the right to be represented by counsel at all stages of the proceedings. If the party is a child, the child shall be represented by counsel at all critical stages.
Even if it is considered that the children were not parties to these proceedings, § 43-21-203 offers further support for the argument that they were entitled to their own counsel. Relevant subsections provide:
(6) ... Any person found by the youth court to have a direct interest in the cause shall have the right to appear and be represented by legal counsel.
* * * * * *
(8) The youth court may exclude the attendance of a child from a hearing in neglect and abuse cases with consent of the child's counsel.
This Court recognizes that a valid argument could be made that DHS never raised the specific issue of lack of representation at the May 24, 1993 hearing, but rather *1386 raised it during the Motion for Reconsideration. However, it was clearly raised during the request for reconsideration by both DHS and the two minors through attorney Jim Kitchens. This Court can find "manifest error" in the chancellor's failure to appoint a guardian ad litem to represent the children's "best interest." Murphy v. Murphy, 631 So.2d 812 (Miss. 1994) (where manifest error standard of review was applied to a chancellor's decision to hold in abeyance the appointing of a guardian ad litem); Smith v. Jones, 91-CA-01184, Slip Op. at 14; Luttrell v. Kneisly, 427 So.2d 1384, 1387 (Miss. 1983) (Chancellor manifestly erred in not appointing a guardian ad litem which is mandatory and not permissive under statute).

II. THE APPROPRIATE LEGAL STANDARDS WERE NOT APPLIED BY THE TRIAL COURT.
DHS contends the chancellor erroneously considered Miss. Code Ann. § 43-15-15 in determining the relevant standard for disposition of this case. That section directs the State Department of Public Welfare to maintain a registry of the children in custody of the various welfare agencies, with classifications such as "temporary custody, ... not to exceed three (3) months" and "children freed for adoption," for example. The chapter containing § 43-15-15 entitled, "Administration of Child Welfare Law," which authorizes and directs the State Welfare Department to cooperate with the U.S. Children's Bureau to provide child welfare services. See § 43-15-3.
DHS contends the chancellor should have applied the standards found within the Youth Court Law, specifically referring to § 43-21-103 and 43-21-613. DHS is correct. Miss. Code Ann. § 43-21-103 construes the purpose of the youth court law as directed toward the end that all children within the youth court system will become productive, responsible citizens, and "that each such child shall receive such care, guidance and control, ... toward that end ... in the state's and the child's best interest." Section 43-21-613 provides that orders of the youth court determining the disposition of a child who has been adjudicated neglected, for instance, may be modified in the discretion of the youth court thereafter, as necessary. Subsection (2) provides:
On motion of a child or child's parent, guardian or custodian, the youth court may, in its discretion, conduct an informal hearing to review the disposition order. If the youth court finds a material change of circumstances relating to the disposition of the child, the youth court may modify the disposition order to any appropriate disposition... .
(emphasis added).
A combined reading of these two sections clearly indicates that the applicable standard for the chancellor's consideration was "that there has been a material change in circumstances as to custody that would benefit and be for the best interest of the children."
This Court has stated the applicable standard of care in In Interest of T.T., 427 So.2d 1382 (Miss. 1983). T.T.'s custody was assumed by the Harrison County Department of Public Welfare after reports of sexual abuse by the child's father. On appeal, the parents of T.T. argued it was error to allow proceedings for the termination of their parental rights to be instituted after they demonstrated compliance with the requirements the lower court had ordered. This Court disagreed, holding that despite meeting the formal requirements to have their child returned to them, "surely the Family Court, having concern for the best interest and future of a minor child, has the authority to direct the Department of Public Welfare ... to institute proceedings for the termination of parental rights." Id. at 1384. (emphasis added).
"Our decisions have always stated the cardinal principle to be applied to custody decisions is that which is in the best interests and welfare of the minor child." Albright v. Albright, 437 So.2d 1003, 1004 (Miss. 1983), citing Brown v. Brown, 237 Miss. 53, 112 So.2d 556 (1959); Buntyn v. Smallwood, 412 *1387 So.2d 236 (Miss. 1982). Therefore, the focus does not change in custody matters where it is not one parent vying against the other for custody of their child, but rather, DHS seeking to retain custody of a neglected or abused child rather than have him returned to a parent.
Incredibly, counsel for Linda D., denying that the chancellor below applied the incorrect standard, expressly denied that the best interests of the children should have any bearing on the chancellor's decision. During examination of a DHS social worker, the following transpired:
Q: Mrs. Taylor do you have an opinion, based upon your work as a social worker on this case, as to what would be in the best interest of these children at this time?
BY MR. ARRINGTON: Your honor, I object. I don't believe the best interest is in the Department of Human Services health care, it's as a parent she's fit to require to have her children returned to her, not what's in the best interest of the children.
Such argument ignores the fact that the reason for repeatedly held dispositional custody hearings since 1990 was to supposedly determine the best interest of the children and whether that interest was served in returning them to Linda D. On each occasion prior to May 1993 it was apparently determined that such best interest was served by maintaining custody in DHS rather than returning the children to Linda D.
The original order entered after the May 1993 hearing, in error, failed to place custody of the children with Linda D. and failed to mention that the children's "best interest" was even considered. A corrected order did place custody with Linda D. but again failed to mention that the chancellor's determination considered the best interests of the children.
A review of decisions from other jurisdictions specifically holding that compliance with rehabilitative plans by a parent does not mean custody is automatically restored is helpful in addressing this issue. In Shields v. State Dept. of Human Resources, 531 So.2d 681 (Ala. Civ. App. 1988), the Court reviewed the decision of the juvenile court judge that three minor children adjudicated dependent and placed in the custody of the Department of Human Resources (DHS), should be returned to their natural mother on a trial basis. The children's guardian ad litem appealed the decision, arguing an incorrect standard was applied to the mother's petition to have custody restored. The court of appeals pointed to the decision in Matter of Moore, 475 So.2d 882 (Ala. Civ. App. 1985), where the applicable standard was cited: "A parent seeking to regain custody of a child, which custody had been lost by a prior court decree, must prove that a change in custody will materially promote the best interests of the child." Shields, 531 So.2d at 682, citing Moore, 475 So.2d at 883.
The Court in Shields reversed for application of the correct legal standard. It was stated:
In the case at bar the juvenile court specifically held that the test was not whether a change in custody from the nonparent to the parent who had previously lost custody by a prior decree required the parent to prove that the change in custody would materially promote the best interests of the child. The juvenile court said that the parent was required to prove only that the causes for the declaration of dependency have been removed and that she has taken the required steps for rehabilitation as a parent.
A review of the record reveals that the evidence heard by the referee was concerned mainly with the rehabilitation of the mother and her present fitness to have custody of the children. There is very little evidence relating to the aunt's custody of the children and the disruptive effect of uprooting the children and returning them to the mother.
531 So.2d at 682.
Also, in In re Estate of Cherry Whittington, 124 Ill. App.3d 198, 79 Ill.Dec. 539, 463 *1388 N.E.2d 1314 (1984), Cherry Whittington killed her husband and was committed to a mental health center. The parties' son was two months old and went to live with his great-aunt, later appointed his guardian. Id. at 79 Ill.Dec. at 540, 463 N.E.2d at 1315. The mother was released to a halfway house and filed petitions seeking, in part, to have the child's guardianship terminated and her custody restored. Four years later, the mother filed a second series of petitions again seeking custody of her son. The trial court dismissed the guardian's motion to dismiss, granted the mother's motion for summary judgment, but stayed execution pending the outcome of the appeal. The appeals court held the case should be reversed and remanded due to the application of the incorrect standard of law. The court observed:
On several occasions during this proceeding the judge referred to what he called a presumption that a parent has first call upon the custody of a child. The Illinois Supreme Court, however, has frequently stated the standard in Illinois in custody matters as the `best interest of the child' standard. Fitness of the parent is only one element to be considered in determining what is in a child's best interest. In this case, the only evidence before the court had to do with Cherry's fitness. There was no evidence suggesting that Richard was anything but healthy, well adjusted and happy living with [her aunt]. The fact is that Richard had never known another home and Cherry was for all practical purposes a stranger to him.
We do not find that the circuit court applied the correct standard in awarding custody to Cherry Whittington because the trial judge considered only evidence as to the fitness of the natural mother and not evidence of what was in the best interest of the child. We commend the trial judge for granting stay of execution so that this case could be properly reviewed.
Id. at 79 Ill.Dec. at 541, 463 N.E.2d at 1317.
The review of the decisions set forth above indicates a strong trend against courts looking only to a natural parent's performance of a "treatment plan" or, in this case, a "service agreement," to determine whether that parent's petition to restore custody should be granted. The common theme surfacing with the cases analyzed is the need to maintain a clear focus on what is in the best interest of the children concerned.
As in several of the reviewed cases, the lower court in the case sub judice appeared to place primary significance on the length of time the children had been in foster care, and the fact that Linda D. had substantially complied with the requirements in the service agreement. Nowhere, however, is the best interest of R.D. and B.D. mentioned, nor are there any findings of fact made relevant thereto. The proper standard here is unquestionably a consideration of what is in the children's "best interest."
Attorney Kitchens, arguing for the motion for reconsideration, stressed to the chancellor the importance of placing the children's best interest first and foremost. He submitted it would be difficult to make such a determination because "the court simply does not have before it sufficient information about the current situation in that home to justify returning those children to it where they've been absent now for several years." Kitchens pointed out virtually no home inspections of Linda's trailer were carried out since the children were taken into DHS custody because the DHS worker was afraid to return to the home after several unsuccessful visits. Second, Linda's mental health reports and records were not available until subpoenaed at trial for examination by the court or DHS due to Linda's refusal to release this information. This situation, coupled with the fact that the children were unrepresented and their views had not been heard and considered by the court, meant the children should not be returned to Linda until the matter could be reopened and more information relevant to their best interest was presented. In spite of this valid argument by Kitchens the motion for reconsideration was denied. The chancellor should have granted Kitchens' request and re-opened proceedings.
*1389 Review of the entire record indicates that the chancellor was most concerned with the length of time the children had been kept in foster care, and second, with the fact that Linda appeared to have satisfied the technical requirements established by DHS. The chancellor was correct to be concerned about the length of time the children had been in foster care. All too often children seem to remain forgotten and permanently implanted in the foster care system. However, length of time in foster care pales compared to the fact that nowhere in the court's bench decision or the order restoring custody is the effect of the court's decision or the children's best interests being considered ever mentioned. Because it is clear that the incorrect standard was applied, this matter should be reversed and remanded for further proceedings utilizing the "best interest" of the child, the correct standard of proof.
This issue has merit and the chancellor erred.

III. THE COURT'S DECISION TO RETURN THE CHILDREN WAS AGAINST THE OVERWHELMING WEIGHT OF EVIDENCE
DHS relies on testimony adduced from various mental health professionals, social workers, and from Linda herself to establish that the decision to return R.D. and B.D. to Linda's care was unsupported by the record evidence.
DHS further cites Interest of D.C. 436 N.W.2d 644 (Iowa Ct. App. 1988), wherein the Iowa Court of Appeals stated that one indication of future parenting skills is past performance of the parent. In the case at bar, DHS submits, nothing has changed about Linda's parenting skills or situation because, "in her own words ... nothing was her fault."
Linda disagrees, citing as support for her position, her compliance with the service agreement. She argues the traditional standard this Court operates under when reviewing a chancellor's findings, is that such findings will not be reversed unless manifest error is shown, and that standard should apply in this case to affirm the finding that her children should be returned to her. See Vance v. Vance, 582 So.2d 514 (Miss. 1991).
This Court has determined that the proper standard to be applied is the best interest of the children, which must guide the chancellor's disposition order. Linda's compliance with the service agreement, in and of itself, is insufficient to warrant a finding that her children should be returned. It is simply one element of proof to be considered.
A review of cases in other jurisdictions concerning this issue is indeed helpful. In In the Interest of R.W.H., 447 So.2d 341 (Fla. 4th DCA 1984), the Florida Court of Appeals considered the appeal of a mother whose parental rights were terminated upon a finding that she had abused and neglected her minor child, and that she had not fulfilled the requirements of the "performance agreement" developed by that state's Health and Rehabilitative Services Department. Affirming the decision of the lower court which the appeals court found to be supported by the record, the appeals court poignantly observed:
Our closing thought is an observation about the split decision of our companion court in In the Interest of A.B., 444 So.2d 981 (Fla. 1st DCA 1983)... . The court in that case recognized, as this court did in In the Interest of J.L.P., 416 So.2d 1250 (Fla. 4th DCA 1982) that either neglect or abuse may be proved prospectively. However, we feel our companion court viewed the parental performance agreements . .. as only two dimensional; i.e., if the parent performed, the child is to be returned; and if not, the child is to be committed for adoption. The interest of a child, however, like the Hope Diamond, is multidimensional, and other alternatives, such as long term foster care or independent living must be a consideration. Children are not cards to be placed in slots. Their needs require imaginative flexibility, not slavish categorization. We simply cannot engage in tunnel vision when a child's welfare is at stake; every reasonable option must be *1390 available. In the case before this court, the parent did not perform, so we are not faced with consideration of alternatives. Let us hypothesize, however, that notwithstanding complete performance by the parent, objective investigation still revealed substantial reasons not to return the child to the parent. We need not be prisoners of our self-constructed intellectual walls, nor can we be, when a child is involved, just because `a deal's a deal.' The child never signs the performance agreement and the court never sees it until review is sought. An agreement so executed by adults can not fetter the court, whose primary concern must be the child.
Id. at 342-43. (emphasis added).
Returning to the case at bar, other than testimony from Linda, the great weight of the evidence indicated that the children's best interest was not served in their being returned to Linda D. at this time. It should be kept in mind that unlike many of the decisions reviewed, this appeal did not result from an order finally terminating Linda D.'s, parental rights.
We note however, that the record reveals at the May 1993 hearing, a Termination of Parental Rights Petition (TPR) was pending against Linda D. filed by DHS before the Chancery Court of Copiah County. This was even more reason for the chancellor to reconsider his decision as the same chancellor would also ultimately determine the outcome of the TPR Petition.
Reviewing the testimony of Linda, her social workers, her mental health counselors, particularly Steve Fisher and Cindy Kinard, and what little information the CASA, Sally Garland, was allowed to offer, it seems clear that almost nothing has changed about Linda's situation or her attitude toward caring for her children since she lost custody. The evidence suggests she was merely jumping through the required hoops, doing everything she thought necessary to have her children returned, while keeping a closed mind to the reasons that they were found to be neglected by her in the first place.
Attorney Kitchens, who personally interviewed the children, informed the court the children did not want to return to Linda's home and were afraid of her. The overwhelming weight of the evidence supports continued observation and counseling of and for Linda and foster care for the children. At the very least, more evidence at a proper hearing, with counsel or a guardian ad litem, or both, appointed for the children should be considered before, as Kitchens stated, "these kids are sent into the unknown." The weight of the evidence certainly does not support restoring custody to Linda simply because she completed most of DHS's service agreement requirements. Indeed, the agreement itself only provides its successful completion "may result in a recommendation ... for a trial return of the children."
This issue is also meritorious. The chancellor was in error.

IV. THE TRIAL COURT IMPROPERLY EXCLUDED THE TESTIMONY OF THE CASA WORKER AND THE DEPARTMENT OF HUMAN SERVICES SOCIAL WORKERS.
DHS argues the CASA, Sally Garland, and social workers should have been allowed to offer observations about the children while in foster care and the basis for their opinions. The chancellor continuously sustained objections to questions inquiring into areas concerning the "best interest" of the children.
Miss. Code Ann. § 43-21-603 indicates that at youth court hearings, to determine the disposition of a child adjudicated as neglected, traditional rules of evidence simply do not apply. That section provides, in relevant part:
(2) All testimony shall be under oath unless waived by all parties and may be in narrative form. The court may consider any evidence which is material and relevant to the disposition of the cause, including hearsay and opinion evidence. (emphasis added).
Section 43-21-613(2) provides that disposition orders may be modified: "On motion of *1391 a child or a child's parent, guardian or custodian, the youth court may, in its discretion, conduct an informal hearing to review the disposition order." In addition, subsection (3) clearly contemplates that upon review of any disposition order, the youth court judge shall have before him for his consideration as much information as possible:
In conducting the review, the judge or referee may require a written report, information or statements from the child's youth court counselor, parent, guardian or custodian which includes, but is not limited to, an evaluation of the child's progress and recommendations for further supervision or treatment.
The Youth Court Act thus clearly contemplates that strict adherence to our rules of evidence will not be required, and indeed, concerns over hearsay evidence and the like are basically dismissed.
Finally, a complete reading of § 43-21-613(3) leads to the inescapable conclusion that testimony regarding a child's progress from those best able to comment is encouraged. In the case of B.D. and R.D., considering the failure to appoint them a guardian ad litem, certainly the testimony of the social workers specifically assigned to their cases should have been allowed. Since the record did not reflect an order appointing the CASA Garland, and the chancellor specifically stated that no such appointment occurred, the chancellor was not in error prohibiting Garland's testimony. However, a CASA Program was established by the chancellor and Garland was apparently actively participating in the case on behalf of the children, and the pleadings within the record so indicated. On remand, the chancellor may certainly correct this apparent oversight, enter the appropriate order and in his discretion consider allowing Garland's testimony.

CONCLUSION
We cannot say that the chancellor erred in denying Garland's testimony as there were no orders filed appointing Garland. However, it appears oversight caused this problem. On remand the chancellor in his sound discretion, may sign an order appointing Garland and consider her testimony.
This case is affirmed in part, and reversed in part and remanded for all of those reasons previously mentioned for further proceedings to determine, under the appropriate standard, what is in the best interest of R.D. and B.D. Upon remand, the children should have the benefit of a guardian ad litem. The chancellor should also consider legal counsel for the children if Jim Kitchens is no longer representing the children. Further, disposition of the children should take into account the children's testimony, such as through an in-chambers hearing with the court, if necessary, and the relevant testimony of all persons involved in the children's case, such as their CASA and social workers, could be received in the sound discretion of the chancellor.
AFFIRMED IN PART, REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS and JAMES L. ROBERTS, Jr., JJ., concur.
DAN M. LEE, P.J., concurs in result only.
McRAE, J., not participating.