**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2001-CA-01309-SCT**

*HELEN BARNETT*

*v.*

*CHARLES E. OATHOUT*

**ON MOTION FOR REHEARING**

DATE OF JUDGMENT:          7/18/2001
TRIAL JUDGE:          HON. JOHN C. ROSS, JR.
COURT FROM WHICH APPEALED:          LEE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          GARY L. CARNATHAN
ATTORNEYS FOR APPELLEE:          ALLISON FARESE THOMAS
          DAVID LEE ROBINSON

NATURE OF THE CASE:          CIVIL - CUSTODY
DISPOSITION:          AFFIRMED - 10/07/2004
MOTION FOR REHEARING FILED:          11/13/2003
MANDATE ISSUED:

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    The motion for rehearing is granted. The original opinions are withdrawn, and this opinion is substituted therefor.

¶2.    This is a case in which the Mississippi Department of Human Services (DHS) removed two children from their home in April, 1996 based on a finding of medical neglect.[1] Two and a half years later, after the boy's parents divorced, the Foster Care Review Board recommended that DHS begin termination of

---

[1] The two boys, ages 15 months and 5 1/2 months, had asthma and hydrocephalus (fluid on the brain) and were in the hospital when DHS removed them from their parents' home. DHS determined that the parents were not capable of caring for the children with these medical problems.

parental rights proceedings. Rather than terminating parental rights, the Lee County Youth Court, in December, 1998, awarded durable legal custody of the children to the foster parents who had been the children's care-givers for much of the two and a half years in which they had been in the legal custody of DHS.[2] Two weeks later, after the foster mother, Helen Barnett, refused to allow visitation to Charles E. Oathout, the natural father, Charles filed a petition in chancery court for modification of custody, or alternatively, to obtain visitation rights, which had not been specifically awarded in the Youth Court Order. Visitation was granted, but the chancellor denied the motion for a change in custody, stating: "[i]n order to warrant a change of custody . . . the moving party would be required to show a material change of circumstances since the rendition of the Youth Court Order dated 12/3/98."

¶3. During the next year and a half the relationship between Charles and Helen became acrimonious. Many motions were filed in the chancery court, Charles attempting to gain custody of the boys and Helen attempting to terminate Charles's visitation. In December, 1999, after Helen filed a motion to terminate visitation, and Charles answered with a counter motion for contempt because Helen refused to allow court ordered visitation, the court appointed a guardian ad litem to represent the interests of the children. Although some visitation was occurring, communications between Charles and Helen had come to a halt, and Charles complained that he was not able to find out anything about the children or their medical condition.

¶4. During this period of time, in May, 1999, Charles married Karlene, a nurse of 11 years, and they had a child together in March, 2000. There is a general consensus among the chancellor, guardian ad litem, and the witnesses for both parties, that his marriage to Karlene was a turning point in Charles's life. In July, 2000, Charles filed a new petition for custody modification, arguing that Helen's unjustified refusal to allow

---

[2] The record does not contain any additional information pertaining to the youth court proceeding.

visitation at times and also her refusal on several occasions to allow telephone contact between Charles and the boys constituted a material change in circumstances adverse to the children.

¶5.     A three-day hearing was held in chancery court. In July of 2001, in a 25-page written opinion, the same chancellor who had previously denied a change of custody because there was no showing of an adverse change in circumstances, now awarded custody of the boys to Charles, finding that:

> Helen Barnett's actions against Charles E. Oathout constitute a material and substantial change of circumstances which has adversely affected the children. Charles E. Oathout has sincerely and substantially changed his circumstances and proven to this Court that he is now worthy of caring for his two children. This Court is of the opinion that it would be in the children's best interest to be returned to their natural father. Charles E. Oathout is hereby granted full care, custody and control of his two minor children. . .

Aggrieved by this decision, Helen appealed to this Court. Finding that the chancellor committed no error, we affirm the trial court.

## STANDARD OF REVIEW

¶6.     "A chancellor's decision cannot be disturbed 'unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or an erroneous legal standard was applied." *Blevins v. Bardwell*, 784 So.2d 166, 168 (Miss. 2001) (quoting *Madden v. Rhodes*, 626 So.2d 608, 616 (Miss. 1993)). "The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each." *Lee v. Lee*, 798 So.2d 1284, 1288 (Miss. 2001) (citing *Chamblee v. Chamblee*, 637 So.2d 850, 860 (Miss. 1994)). "[W]e will not arbitrarily substitute our judgment for that of a chancellor who is in the best position to evaluate all factors relating to the best interest of the child." *Ash v. Ash*, 622 So.2d 1264, 1266 (Miss. 1993) (quoting *Yates v. Yates*, 284 So.2d 46, 47 (Miss. 1973)).

## ANALYSIS

3

¶7. Helen argues that the chancellor erred in applying the legal standard for custody modification cases, by placing emphasis on Charles as a natural parent and by placing too much emphasis on Charles's rehabilitation and present fitness to have custody, rather than whether the change of custody is in the best interest of the children. Additionally, Helen argues that the chancellor's findings in this case were manifestly wrong and against the weight of the evidence. Helen states that the applicable standard in child custody modification cases is "that there has been a material change in circumstances as to the custody that would benefit and be for the best interests of the children." *In re R.D.*, 658 So.2d 1378, 1386 (Miss. 1995). Helen supports her argument by pointing to the use of the words "natural father" in the chancellor's opinion and the chancellor's statement that Helen "as a foster mother was under a duty to provide such care to the children and was properly compensated for her services by [DHS]." Helen also argues that there is insufficient evidence to find that Helen's conduct presented a change in circumstance adverse to the children.

¶8. Helen's suggestion that the chancellor used the natural parent presumption is misplaced. The natural parent presumption presumes:

> that best interests of a child will be preserved by it remaining with its parents or parent. In order to overcome this presumption there must be a clear showing that the parent has (1) abandoned the child, or (2) the conduct of the parent is so immoral (as) to be detrimental to the child, or (3) the parent is unfit mentally or otherwise to have the custody of his or her child. *McKee v. Flynt*, 630 So.2d 44, 47 (Miss. 1993); *Carter v. Taylor*, 611 So.2d 874, 876 (Miss. 1992); *Rodgers v. Rodgers*, 274 So.2d 671, 672 (Miss. 1973). Absent clear proof of one of the above circumstances, the natural parent is entitled to custody of his or her child. *McKee*, 630 So.2d at 47 (citing *Rutland v. Pridgen*, 493 So.2d 952, 954 (Miss. 1986)).

*Grant v. Martin*, 757 So.2d 264, 265 (Miss. 2000). Had the chancellor relied on the natural parent presumption, there would have been no burden placed on Charles to show that there was a material change adverse to the children, and Helen would have been required to show that Charles had abandoned his

4

children or that he was unfit to be a parent. The chancellor never mentioned the natural parent presumption, and there was no discussion of Helen's ability or inability to prove abandonment or Charles's unfitness as a parent. The burden was placed on Charles to show a substantial change in circumstances adverse to the children. This was true both when the first petition for modification of custody was denied and during the second modification proceeding, in which custody was awarded to Charles. As quoted above, the chancellor found that Charles had shown that there was a substantial change in circumstances adverse to the children and that it would be in the children's best interest to be reunited with their father. This is not a finding based on the natural parent presumption.

¶9.     As conceded by Helen, the proper standard for use in DHS cases was announced in the case of *In re R.D*, 658 So.2d 1378 (Miss. 1995). There, this Court agreed with DHS's assertion that a chancellor should apply the standards found within the Youth Court Law, specifically Miss. Code Ann. §§ 43-21-103 and 43-21-613. Section 43-21-103 discusses that a purpose of the youth court law is to provide services that are in the state's *and the child's best interest*. Section 43-21-613 provides that orders of the youth court determining the disposition of a child who has been adjudicated neglected may be modified in the discretion of the youth court thereafter, as necessary. Specifically, subsection (2) provides:

> On motion of a child or child's parent, guardian or custodian, the youth court may, in its discretion, conduct an informal hearing to review the disposition order. *If the youth court finds a material change of circumstances relating to the disposition of the child*, the youth court may modify the disposition order to any appropriate disposition . . .

*In re R.D*, 658 So.2d at 1386. We stated:

> A combined reading of these two sections clearly indicates that the applicable standard for the chancellor's consideration was "that there has been a material change in circumstances as to custody that would benefit and be for the best interest of the children."

5

*Id.* Additionally, in comparing this standard to the normal standard between competing parents, the Court stated "[t]herefore, the focus does not change in custody matters where it is not one parent vying against the other for custody of their child, but rather, DHS seeking to retain custody of a neglected or abused child rather than have him returned to a parent." *Id.* at 1387. This standard has since been reiterated. *K.D.G.L.B.P. v. Hinds County Dep't of Human Servs.*, 771 So.2d 907 (Miss. 2000); *In re T.A.P.*, 742 So.2d 1095 (Miss. 1999).

¶10.    Contrary to the legal arguments before this Court, the legal standard announced in *Grant v. Martin*, 757 So.2d 264 (Miss. 2000), does not apply in this case. DHS was not involved in *Grant*. In *Grant*, a couple signed a voluntary agreement as part of an irreconcilable differences divorce, stating that the children would remain in the custody of their paternal grandmother. During the next four years, the children's mother exercised visitation, but  was not even interested enough in the children's medical or school activities to find out the names of the children's doctors or teachers. Four years later, only after the mother remarried, did the mother attempt to regain custody of the children by claiming the natural parent presumption. This Court in *Grant* stated:

> Our law clearly has a strong presumption that a natural parent's right to custody is superior to that of third parties, whether grandparents or others. This is as it should be. However, this Court has never before been asked to rule on whether the natural parents' consent to and joinder in court proceedings granting custody to such third parties should alter that presumption. Because stability in the lives of children is of such great importance, we have carefully weighed the impact of establishing an exception, or a new standard, for such instances. While we do not want to discourage the voluntary relinquishment of custody in dire circumstances where a parent, for whatever reason, is truly unable to provide the care and stability a child needs, neither do we want to encourage an irresponsible parent to relinquish their child's custody to another for convenience sake, and then be able to come back into the child's life years later and simply claim the natural parents' presumption as it stands today.

*Grant v. Martin* 757 So.2d 264, 266 (Miss. 2000). In the present case, the boys were removed from the Oathout home by DHS, and placed in a foster home, because the parents were incapable of taking care of the boys' medical problems. According to the child welfare statutes, specifically, § 43-15-13, a major goal of DHS is to place children in its custody into a permanent living arrangement at the earliest opportunity. Termination of parental rights proceedings must be started within 15 months of adjudication of neglect unless the child has been placed in durable legal custody or long-term or formalized foster care by a court of competent jurisdiction, or DHS has determined that there are compelling or extraordinary reasons why termination of parental rights would not be in the best interest of the child. *See* Miss. Code Ann. § 45-15-13 (2)(f), (3) & (4). When DHS started termination of parental rights proceedings in the present case, the Youth Court, rather than terminating parental rights, awarded durable legal custody to Helen. The Youth Court proceedings are not part of this record, but it is clear from the surrounding circumstances that this is not the type of voluntary relinquishment of custody for convenience sake that was contemplated in *Grant*. The fact that Charles filed a petition for modification of custody only two weeks after durable legal custody was awarded supports the supposition that this was not a "voluntary" act. It was more than likely an acquiescence on the part of Charles in an effort to avoid termination of parental rights proceedings.

¶11. Helen argues that her status as durable legal custodian affords her greater rights than that of a foster parent. It is not clear from the statute what rights durable legal custody provides to the legal custodian. Durable legal custody was discussed at length in reference to termination of parental rights in the case of *In re S.A.M.*, 826 So.2d 1266, 1272 (Miss. 2002), where we stated:

> Miss. Code Ann. § 93-15-103(h) (2000) provides durable legal custody as an alternative
> to termination of parental rights:

7

> Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the Department of Human Services should be considered as alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights.

Miss. Code Ann. § 43-21-105(y) further provides that:

> Durable legal custody means the legal status created by a court order which gives the durable legal custodian the responsibilities of physical possession of the child and the duty to provide him with care, nurture, welfare, food, shelter, education and reasonable medical care. All these duties as enumerated are subject to the residual rights and responsibilities of the natural parent(s) or guardian(s) of the child or children.

> The fact that under durable legal custody the parent retains some form of residual rights and responsibilities is a vital and obvious distinction to termination of parental rights. **Another distinction is that a decision to grant durable legal custody is not permanent and is, therefore, subject to further review and modification by the courts**.

*In re S.A.M.*, 826 So.2d at 1279 (emphasis added). Additionally, this Court has stated that "the intent of durable legal custody is merely to avoid the required annual dispositional reviews by the youth court and constant oversight and monitoring by DHS, not a complete preclusion of the court's jurisdiction, DHS's further involvement or court ordered review hearings as needed." *Id.* at 1279. Thus, we do not agree that the granting of durable legal custody to Helen gave her any greater rights than those of a foster parent.

¶12. The legal standard used by the chancellor was correct. The chancellor had to make two determinations: first, whether Charles showed that there was a substantial change of circumstances which adversely affected the children, where it would be in the children's best interest that custody be changed; and second, whether Charles showed that he had eliminated the behavior that caused the children to be taken in the first place. *See D.J.V. v. Bolivar DHS ex rel. McDaniel*, 824 So.2d 617 (Miss. 2002).

The chancellor's findings addressed both of these questions: that there was a material change in circumstances adverse to the children such that the best interest of the children would be served by a modification of custody and that Charles had corrected the situation which caused the children to be removed initially.

¶13. In fact, there was substantial credible evidence in the record supporting the chancellor's findings on both questions. A three-day hearing was held on August 9 and 10, 2000, and May 2, 2001. The chancellor, in a 25-page opinion, summarized the facts of the case, then summarized the testimony of the witnesses, and discussed the guardian ad litem's report and why he disagreed with its conclusion. His opinion is summarized further here:

*Case background:*

¶14. The chancellor first discussed Charles and Brenda's unstable marital situation, and their inability to care for their children who both have serious medical problems, and the resulting removal of the boys from the Oathout home. He discussed Charles's unstable work history and the fact that Charles had been fired the previous year. He discussed Charles's marriage to Karlene, that they live in a mobile home which is paid for on four acres of land which they own in Walnut, Mississippi, and that Charles now worked at Dover Elevator Company, which is a steady, good paying job close to his home. He noted that Charles testified that he no longer drinks or smokes, has passed all drugs test given him, and has completed all of the DHS parenting classes.

¶15. The chancellor then discussed some of the problems that he felt Helen was causing. After one visitation, Helen reported to the Alcorn County DHS that one of the boys was burned while visiting Charles. The guardian ad litem and the chancellor agreed that Charles's version of events, that it was not a burn, but a scrape received from a fall from a tree, was more probable. DHS did not pursue the

9

complaint. Helen refused the next visitation and put a block on her phone so that Charles could not speak to the boys between visits. The chancellor stated "Helen Barnett has always caused [Charles] problems with his visitation with the two boys, particularly in scheduling the visits."

*Charles Oathout's witnesses:*

¶16.    Max Walker, a licensed marriage and family therapist, and expert witness for Charles Oathout, testified that he conducted a home study of Charles's home and found nothing that would cause any problems for the children, and stated that Charles and the two boys "interact normally." He testified that Charles was depressed by the situation, but that his personality was not such that he would abuse the boys. He also testified that Charles had brought the younger boy in to see him for depression. He testified that he was concerned that Helen had "programmed" the boys to call their father Charles, rather than "father" or "daddy," and that continued custody with Barnett could be "potentially damaging" to the boys. He conceded on cross-examination that he knew that a third child had been removed from the Oathout home,[3] that in early 1997 Charles had been found smoking marijuana in front of the older boy who was at the time a little over two years old, and that DHS had required Charles to go to drug counseling. He stated that he had not talked with Helen, but he had requested Helen to come to his office, which she did not do. He asserted his opinion that custody should be restored to Charles because "people can change."

¶17.    Ray Flanagan, a minister, stated that he had known Charles since Charles was five or six years old, when Charles came to his church when he was the youth director. He stated that Charles had stayed away from church a long time, but had been bringing the boys to church for a couple of years prior to DHS taking

---

[3] A girl born after the boys was removed from the home due to suspected "shaken baby syndrome." Charles was not the natural father of this child. Charles took a lie detector test and was cleared of wrongdoing.

custody of them. He agreed to allow Charles's supervised visitation to occur in his home. He said the boys were always glad to see Charles, did not seem to be afraid of Charles, and were typical young boys.

¶18.    Karlene Oathout, Charles's new wife, testified that she had been a nurse for 11 years, and knew how to administer the boys' medications and breathing treatments. She brought two children into the marriage, and she and Charles have had one child together. She has a close-knit family that lives close by. She had not worked since her last child was born, but planned to go back. She testified that she gets along well with the boys as do her children. She said that Charles had straightened up his life since they met and that they now attend church regularly. She has epilepsy which is controlled by medication.

¶19.    Brenda, Oathout's first wife and the mother of the boys, testified that Charles is a good father and the boys would be safe with him. She stated that Charles allowed her to visit the boys and talk to them on the phone when they were with him. She stated that Helen has also allowed her to visit with the boys, but Helen told her that if she "spoke for Charles" at the trial, Helen would no longer allow it.

¶20.    Carolyn Oathout, Charles's mother, testified that Helen was at one time a friend of hers and that she allowed Helen to babysit the boys during the week, while she was away on her job driving a truck. She had custody of the boys for a while, then shared custody with Helen. She and Helen eventually had problems, after which Helen would not allow Carolyn to visit the boys. She said she did not intend Helen to get custody of the children. She acknowledged that Charles has had problems, but stated that she would not help him get custody of the boys if she thought he would hurt them. She also stated that Charles and Karlene together are able to administer the boys' medical treatments.

¶21.    Polly Martin, Karlene's sister, testified that Charles is a good father and that Karlene and the two boys get along well.

*DHS workers and Helen Barnett's Witnesses:*

¶22.    Mary Lee Robinson, a social worker for the Lee County DHS, and a witness for Barnett, stated that she was involved in the case until 1998, but had not seen Charles since then, nor met Karlene, nor been in Charles and Karlene's home. She read from her DHS case file that a 1996 DHS service agreement was never completed by Charles and Brenda, that Charles refused to sign a second agreement, but that both Charles and Brenda later completed parenting classes. The file showed that in 1997, when the older son, then age 2, was on trial placement with Charles and Brenda, Charles's mother found Charles smoking marijuana in the child's presence. She noted that Charles was "sporadically in and out" of the children's lives during this period. Her file showed that Helen was given durable legal custody in December of 1998, and that DHS records show allegations of child abuse against Charles in March and October, 1999, and in July 2000.[4] The record shows that the March, 1999 allegation was substantiated. Although she had not been involved in the case since 1998, she believed that the children had "bonded" with Helen and it would be harmful to totally remove them from Helen's home.

¶23.    Leslie Hinds, a clinical social worker at the Mantachie Clinic and a witness for Barnett, said she had met with both children seven or eight times over a three to four month period. Helen was present during the sessions. She stated that the younger boy was visibly upset about the idea of visiting his father, but the older boy was not. This is in contrast to the testimony of her co-worker, Dr. Trudy Porter, discussed below. Hinds stated that Helen had told her that the younger boy did not want to visit his father and that Helen might be "unintentionally" influencing the minor children against Charles. She testified that she had never met Charles and would need "extensive sessions" with all parties before giving a final opinion in the case.

---

[4] No abuse charges were ever pursued against Charles.

¶24. Sonja Sanderson, a social worker for the Prentiss County DHS, testified for Helen regarding the investigation into "shaken baby syndrome" suffered by the third child who was removed from the Oathout home. She testified on cross-examination that Charles had passed a lie detector test with regard to this investigation and that he followed DHS recommendations in the matter.

¶25. Jenny Barnes, a nurse practitioner at Mantachie Clinic, saw the younger child when Helen brought him to the clinic for "cigarette burns caused by Karlene." The chancellor's opinion does not indicate any testimony from Ms. Barnes about who should have custody, but she stated that both boys are asthmatic and should not be around smoking.

¶26. Dr. Trudy Porter, a clinical psychologist with the Mantachie Clinic, testified that she had been seeing the boys on a weekly basis since June, 1999, when Helen complained that she thought there were problems with the children after visiting with Charles. She stated that the older child had limited cognitive skills and expressed negative feelings towards Charles, including anger and rejection, but that the younger child was not negative towards Charles, and visitation did not seem to upset him. She stated that she could not tell any difference in the children after a weekend visitation period with Charles. She stated that the children needed counseling due to the impact "all this has had on them." Her opinion was that Helen had not tried to influence the children against Charles and that the children needed security and stability and should remain with Helen because she provides the security and stability they need.

¶27. Mike Burleson testified that he was a private investigator hired by Helen to follow Charles when he had the minor children for visitation. He testified that he had seen Karlene smoking in their van with the children present on one occasion.

*Guardian ad litem's report:*

13

¶28. The chancellor's order then discussed the thoroughness of the guardian ad litem's report, which recommended that the children stay with Helen, but that Charles be given "liberal" visitation. The chancellor briefly discussed the contents of the report, which was an exhibit to his order, noting Charles's unstable past history and his drastic turn for the better after marrying Karlene. The chancellor stated that the report commends Helen for providing a good home, but he also stated that as a foster mother being compensated by DHS, she was under a duty to provide this. The chancellor found that despite the thoroughness of the report, the guardian ad litem had failed to give sufficient weight to the changes that Charles had made in his life and had failed to consider Helen's negative actions toward Charles and the adverse effect these actions have on the children. The chancellor then enumerated the positive aspects of Charles and Karlene's environment and adverse aspects of Helen's conduct. The latter included Helen's obvious strong negative feelings toward Charles, her placing a block on her phone, her prohibiting visitation, her failure to inform Charles of the children's medical and school progress, and her continued allegations of abuse, none of which has caused any agency to take action against Charles. He then discussed that Helen's own witnesses admitted that Helen's conduct had a negative effect on the children and that the guardian ad litem's report stated that Helen's cooperation and encouragement had been greatly lacking with regard to Charles' relationship with his children. The chancellor found that if Helen were awarded continued custody, there was nothing to suggest she would be any more cooperative and that allowing her to continue to attempt to diminish the relationship between the boys and their father "is certainly not in the boys' best interest."

**CONCLUSION**

¶29. The correct legal standard, applicable in DHS cases, was used by the chancellor in making his decision. The chancellor did not rely on the natural parent presumption, and this case is distinguishable

14

from *Grant* because here there was no voluntary relinquishment of custody for convenience. Finally, the chancellor's findings were supported by substantial credible evidence. Therefore, we affirm the chancellor's judgment.

¶30.    **AFFIRMED.**

**SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**