793 So.2d 669 (2001)
P.K.C.G., Appellant
v.
M.K.G., Appellee.
No. 1999-CA-00013-COA.
Court of Appeals of Mississippi.
March 20, 2001.
Rehearing Denied June 12, 2001.
Certiorari Denied September 6, 2001.
*670 John D. Smallwood, Tupelo, for Appellant.
Bradford L. Henry, Roy Joseph Farrell, Tupelo, for Appellee.
Before KING, P.J., BRIDGES, and THOMAS, JJ.
THOMAS, J., for the Court:
¶ 1. P.K.C.G., hereinafter the "mother", appeals the order of the chancellor denying termination of the parental rights of M.K.G., hereinafter the "father", raising the following issues as error:
I. WHETHER THE CHANCELLOR COMMITTED MANIFEST ERROR IN DENYING PLAINTIFF'S REQUEST FOR TERMINATION OF PARENTAL RIGHTS OF THE APPELLEE IN CONTRADICTION OF THE OVERWHELMING EVIDENCE?
II. WHETHER THE GUARDIAN AD LITEM FAILED TO FULLY REPRESENT THE INTEREST OF THE MINOR CHILD AT ISSUE?
Finding no error, we affirm.

FACTS
¶ 2. The child of the parties was born in 1984 and diagnosed with Down's Syndrome. As early as 1987 or 1988 the child exhibited behavior that experts testified could be construed as sexual in nature, such as hunching. Late in 1990 the symptoms of what some doctors diagnosed as sexual abuse became more pronounced. The mother testified that the girl pulled *671 her panties down and pointed to her genital area, saying "Daddy do it." Other examples were details of such conversations and gestures indicating possible abuse.
¶ 3. In 1991 the mother filed for divorce. A hearing was held in August 1991 on whether the father was abusing the daughter. The chancellor found inadequate evidence to support the allegations. The mother dismissed the complaint for divorce, later saying that she did so because she was alarmed that her husband would be awarded unsupervised visitation. In 1992 she again filed for divorce. The mother testified that the daughter had developed various phobias, including fear of water and bathing. The mother testified that the father had frequently bathed the girl. The mother also claims that the daughter was beginning to have uncontrolled bowel movements, a problem she did not normally have. During the pendency of the action, the father was awarded visitation. The mother asserted that improvements in her daughter's emotional state were set back after each visit with the father.
¶ 4. The State Department of Human Services recommended that the daughter be taken to a doctor who specialized in such cases. This doctor diagnosed the daughter with a trauma that was indicative of child sexual abuse. The doctor also stated that the child's vaginal opening was wider than it should have been, and part of her hymen was missing. A second doctor was consulted who had a similar diagnosis and believed there had been anal penetration. There were issues regarding the validity of the examinations and whether the doctors had any knowledge of the psychology of a Down's Syndrome patient who was being questioned. The parties appear to agree that at the time of the exams the girl had an intellectual age of about three years, though her actual age was eight.
¶ 5. The young girl started at a new school in the fall of 1992. The mother taught at the same school. At the school some teachers became alarmed at the girl's sexual conduct and words. Among the incidents was frequent masturbating in class, pulling her dress up, and pointing to her vaginal area, sometimes with the statement "Daddy do it."
¶ 6. It was also agreed that for some period of time the girl carried a plastic spatula, perhaps as other children might carry a stuffed animal or a favorite toy. At least one teacher and also other witnesses testified that the girl used the spatula in ways that the father argues, and the chancellor accepted, would explain the vaginal and rectal trauma.
¶ 7. In December 1992 the father filed for contempt, as the mother was not complying with an earlier visitation order. The mother counterclaimed for emergency relief to terminate visitation due to the alleged abuse. As a result, the divorce action was amended to include a petition to terminate the father's parental rights or a least for denying all visitation. A guardian ad litem, attorney Dan Davis of Tupelo, was appointed.
¶ 8. A trial was held on issues of child custody, support, division of certain marital property and on termination of parental rights. The trial was conducted on various days in January and March, 1995. While those issues were tried, agreement was reached over the divorce itself. A decree of divorce was entered on January 12, 1995.
¶ 9. At trial each parent had expert witnesses. The evidence already recounted on the girl's actions and statements was introduced. The father put on an expert that criticized the clinical examination *672 techniques of the mother's witnesses, especially the use of anatomically-correct dolls and the allowing of the mother to be present while the doctor questioned the girl.
¶ 10. According to a brief filed by the guardian ad litem, he met with each parent separately and also with the daughter. He met in numerous conferences with all participants, including the judge. He participated in the trial and examined three of the witnesses. Near the end of the trial Davis asked the chancellor the manner in which Davis could best assist the chancellor, such as through a conference, a written report, or some recommendations. According to Davis's brief, the chancellor said not to worry about needing to give any input since "we were not dealing with termination of parental rights." Since this was an off-the-record conversation, whether Davis accurately heard or understood the chancellor cannot be reviewed. Of course, termination of the father's rights was exactly what the proceeding did involve. Regardless, Davis gave no report.
¶ 11. The chancery court ruled in 1995 that there existed no signs of sexual abuse and denied the mother's request to terminate parental rights and to deny visitation. Aggrieved by the ruling, the mother filed and perfected an appeal. This Court reversed and remanded the trial court's decision and directed that the following two matters be addressed by the trial court: "that recommendations, a report, or other written or other input from the guardian (ad litem) must occur," and "since the principal concern has to be the girl's best interest, we remand for additional proceedings that would allow relevant updated evidence to be presented if any party request it." P.K.C.G. v. M.K.G., 697 So.2d 1193 (Miss.Ct.App.1997).
¶ 12. Additional proceedings were requested by the parties and the second round of hearings were held on June 3, 1998. The evidence presented was limited by the trial court to evidence existing from April 25, 1995 forward. In this trial the guardian ad litem filed a written report with the trial court clerk. The trial court once again denied the termination of the parental rights of the father. From this decree the mother appeals.

ANALYSIS

I.

WHETHER THE CHANCELLOR COMMITTED MANIFEST ERROR IN DENYING PLAINTIFF'S REQUEST FOR TERMINATION OF PARENTAL RIGHTS OF THE APPELLEE IN CONTRADICTION OF THE OVERWHELMING EVIDENCE?
¶ 13. We begin by restating our well established standard of review employed in addressing matters such as are present in the case before us. "The chancellor's findings of fact are viewed under the manifest error/substantial credible evidence test." Vance v. Lincoln County Dep't. of Pub. Welfare, 582 So.2d 414, 417 (Miss.1991) (citing Bryant v. Cameron, 473 So.2d 174, 179 (Miss.1985); Veselits v. Cruthirds, 548 So.2d 1312, 1316 (Miss. 1989)). Also, our Supreme Court has gone on to state that "a chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this Court to reverse." Williams v. Williams, 656 So.2d 325, 329 (Miss.1995). Under this standard, we accord wide latitude and discretion to our chancellors and their courts because of the benefits present from having heard the testimony and evidence while observing the witnesses and their demeanor. Ainsworth v. Natural Father, 414 So.2d 417, 420 (Miss.1982). However, of equal importance in our application of this standard is our duty to abide by the following, that being "where on review it is apparent the court below has misapprehended the controlling rules of law or has acted pursuant to a substantially *673 erroneous view of the law, we will proceed de novo and promptly reverse." Ethredge v. Yawn, 605 So.2d 761, 764 (Miss. 1992).
¶ 14. In determining whether the chancellor committed a legal error, we must understand the statutory framework for proceedings to terminate parental rights. In termination of parental rights cases, the petitioner must prove that the natural parent either abandoned or deserted the child or is mentally or morally or otherwise unfit to rear or train the minor child. Petit v. Holifield, 443 So.2d 874, 877 (Miss.1984). "The burden of proof is on the party seeking to terminate the parents' rights." Lauderdale County Dep't. of Human Services v. T.H.G. and L.D.G., 614 So.2d 377, 385 (Miss.1992) (citing In Interest of T.T., 427 So.2d 1382, 1384 (Miss.1983)). The burden of proving that a parent's parental rights should be terminated must be met under the "clear and convincing evidence" standard. Miss.Code Ann. § 93-15-109 (Rev.1994). Once the "clear and convincing evidence" standard of proof has been met, the best interest of the child is to be considered. Vance, 582 So.2d at 417; Petit, 443 So.2d at 877.
¶ 15. In cases such as this, the determination of whether the child suffered sexual abuse is a question of fact to be decided by the chancellor. Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss.1987). In the case sub judice, it is very significant that allegations of sexual abuse were previously heard by this trial court and an opinion was entered on August 15, 1991, and April 19, 1995, whereby the trial court specifically found that the allegations of sexual abuse by the father against his minor daughter, were not supported by the evidence and were dismissed. Looking to the record, the trial court heard evidence, both oral and documentary, presented by both the mother and the father. The chancellor found the allegations themselves to be "far fetched." There was no physical evidence linking the father to abuse. The spatula was acknowledged as something that the girl used in ways that would cause the physical effects to her genital area, and the chancellor did not find credible evidence that any person, much less a specific person such as the father, had also caused the physical trauma. The court found that "most importantly" the witnesses had said that the daughter was difficult to understand because of her mental condition. Whatever the girl said had to be interpreted, even if the words themselves were enunciated well enough. The girl did not testify at trial. Implicitly, the chancellor was finding that an opportunity existed for misconstruing her statements or allowing the listener's own preconceptions to give meaning to the girl's comments.
¶ 16. Based upon the proof before the trial court and the reports made by the guardian ad litem, the trial court held that the father did not sexually abuse his minor child. The chancellor had the opportunity to view the witnesses' demeanor to determine whether the charges were true or fabricated. In these types of cases in which one side alleges misconduct while the other denies any wrongdoing, the determination of the worth and credibility of the witnesses are solely for the chancellor.
¶ 17. After careful review of the record and the briefs of both parties, this Court finds that there was no manifest error committed, and there was substantial evidence to support the chancellor's denial to terminate the parental rights of the father.

II.

WHETHER THE GUARDIAN AD LITEM FAILED TO FULLY REPRESENT THE INTEREST OF THE MINOR CHILD AT ISSUE?
¶ 18. Termination of parental rights requires the appointment of a *674 guardian ad litem. Miss.Code Ann. § 93-15-107 (Supp.2000); Luttrell v. Kneisly, 427 So.2d 1384, 1388 (Miss.1983). A guardian was appointed in this case. This mandated guardian is not a mere formality. The Supreme Court in a recent case "expressed its concerns about the importance of the role of the guardian ad litem...." In Interest of R.D., 658 So.2d 1378, 1383 (Miss.1995). One comment from another case that the court quoted was this: "the guardian ad litem `investigates, makes recommendations to a court, or enters reports'...." R.D., 658 So.2d at 1383, quoting Short v. Short, 730 F.Supp. 1037, 1038 (D.Colo.1990). The guardian has "an affirmative duty to zealously represent the child's best interest." In Interest of D.K.L. v. Hall, 652 So.2d 184, 188 (Miss.1995).
¶ 19. In this case the reason for the trial was the mother's desire to terminate the father's parental rights. The chancellor quite properly appointed a guardian ad litem, who actively participated in the proceedings. In this way a minor unable to understand the importance of the proceedings has an advocate for her best interests. This investigator and source of advice is independent of whatever other motivations could be affecting the adult parties. The guardian is not a decision-maker. Still, a guardian who performs his task appropriately is indispensable for a complete presentation of the case.
¶ 20. The guardian ad litem in the instant case played an active role in the hearings, investigated, and provided cross-examinations and a report of his position after the first round of hearings. The guardian ad litem went on to prepare a written report and recommendations after all hearings on the matter were conducted and prior to the trial court's ruling. The guardian ad litem made an adequate effort to represent the best interest of the minor child either by personal meetings or by speaking with the parents. The record shows that the guardian ad litem acted with the necessary zeal and professionalism to discharge his duties. Accordingly, we hold that the guardian ad litem did act to fully represent the best interest of the child.
¶ 21. THE JUDGMENT OF THE PONTOTOC COUNTY CHANCERY COURT IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., BRIDGES, LEE, IRVING, MYERS and CHANDLER, JJ., concur.
PAYNE, J., concurs with separate written opinion.
PAYNE, J., concurring:
¶ 22. I was on the panel and voted with the majority in the first case, and here do the same. However, I must comment that none of us in the judicial system has extensive knowledge concerning either child sexual abuse or concerning characteristics of Down's Syndrome that should allow us to feel comfortable with the outcome of this case. I remember a former Mississippi Supreme Court Justice, who shall forever remain nameless, who was heard to say in regard to a child abuse case, "I just don't believe a father could do that to his child." Therefore, as far as that judge was concerned that particular man did not abuse his child. To the contrary, I understand that our job as judges is to try to discover truth and apply prevailing law to it without interjecting our personal biases or preconceptions. The chancellor in this case was faced with a very difficult case, as are we, but I am troubled by his impression which underlies his decision that the *675 allegations were "so far fetched against the alleged perpetrator that they simply cannot be believed," and that this was a "sham perpetrated by an estranged wife who was simultaneously trying to terminate the father's parental rights, and to destroy him," as this Court noted in its initial opinion on this matter before remand.
¶ 23. I find it obvious from an abundance of the testimony that this child has been introduced to sexual activity which is inappropriate and is beyond her ability to initiate. I also find it obvious that the record does not contain sufficient evidence to connect this father to the abuse. This is similar to the case of Doe v. Doe, 644 So.2d 1199 (Miss.1994), where there was no question about the fact of sexual abuse of the daughter at the deer camp when the child was in her father's custody. However, since there was no conclusive proof as to which of the men in the child's family actually did the acts, nothing could be done to stop the abuse. I understand about "burden of proof," "clear and convincing evidence" and deferential treatment of findings of fact. Nonetheless, I would hope that the opinion in the case sub judice would not be used to aid in disregarding the reality of child abuse, but would be used to reinforce the responsibility of the courts and society to protect these powerless children.
¶ 24. In the 1990's when the subject of child abuse seemed to be the legal "hot item," a popular bumper sticker simply stated, "Listen to the children." Granted, the child in the present case is difficult to understand due to her mental condition and none of us has received the wisdom of Solomon. Yet, it saddens me that we have a child who obviously has been introduced to and allowed to participate in inappropriate sexual behavior for years and the end result is that nothing has changed. This is one of those times that the stark reality of my limitations as a judge bothers me. This is a case where someone in authority in the justice system needs to be emphasizing the best interest of the child, not just the rights of the parents.
¶ 25. Help is available for abused children regardless of who or what is responsible for the abuse. I would hope that these parents would quit fighting and together seek appropriate help for this child. I concur in the opinion, but I abhor the unaddressed situation.