MAXWELL, J.,
for the Court:
¶ 1. Adeline Cole appeals the Lauderdale County Youth Court’s adjudication that she neglected her two minor children, S. and S.C.[1] Cole claims the youth court’s findings were based on insufficient evidence of neglect, and the youth court erred in placing the children in the legal custody of the Lauderdale County Department of Human Services (DHS). Finding sufficient evidence to support the youth court’s determination, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. On October 4, 2007, the Lauderdale County DHS was notified that Cole was possibly neglecting her eight-year-old son, S., and six-year-old son, S.C. Specifically, DHS had been informed that Cole and her children were living in a home without electricity. There were also reports that Cole was abusing alcohol and that her children were attending school in the wrong school district. The children’s father, Shelton Cole, lived in Enterprise, Mississippi, where the children were enrolled in school, but his residence was located in the district served by the Clark-dale Attendance Center. Cole’s apartment was in the Meridian School District.
¶ 3. That same day, Lori Bielefeld, a social worker employed by DHS, and Carla Snowden, a Department of Education attendance officer, responded to the neglect allegations and attempted to visit the children at school. S. was not in attendance that day, but they were able to locate and speak with S.C. Bielefeld asked S.C. about his mother, and he told Bielefeld he was afraid to be at home with Cole.
¶ 4. Bielefeld and Snowden then traveled to Shelton’s home and spoke with him. Shelton told Bielefeld that Cole would occasionally binge drink and spend the night on his sofa. Though Shelton claimed the two children, S. and S.C., stayed with him off and on, Bielefeld noticed the children’s bed was unmade, and there were no children’s clothing or age-appropriate toys in Shelton’s home.
¶ 5. During this visit, Cole and S. arrived at Shelton’s residence. Snowden met briefly with Cole and offered help to assist her in obtaining electricity for her apartment. Snowden also provided Cole with information to assist her alcohol problem.
¶ 6. According to Bielefeld, S. told her that his mother drank, and he was afraid to be at home with her. Bielefeld also learned from Cole that she planned to leave Mississippi and not return. Because of Bielefeld’s concerns about the lack of electricity at Cole’s apartment and Cole’s statement that she was leaving Mississippi, Bielefeld asked Cole to leave the children with Shelton that night.
¶ 7. The next day, October 5, 2007, the children’s school notified Bielefeld that *717 both S. and S.C. were absent. Bielefeld feared Cole had taken the children out of state. She first visited Shelton’s home but found no one there. She and Snowden then proceeded to Cole’s apartment. When they arrived at approximately 10:00 a.m., Cole refused to open the door. Cole explained, from behind the closed door, she was preparing to leave for a funeral in Tennessee.
¶ 8. Bielefeld then asked Cole to confirm the electricity was on in the apartment. At this point, Cole responded that she was nude, and the children were in the bathtub. Shortly thereafter, Bielefeld heard the children say, “no mama no,” followed by a “thump.” After that the apartment got quiet, so Bielefeld called the police.
¶ 9. When the police arrived around 10:20 a.m., Cole refused to open her door. Still speaking from behind the closed door, she told the officers she intended to give the children to DHS. She claimed she was nude, was about to take a shower, and that her children were in the bathtub. Cole told the officers she was preparing to leave for a funeral and would bring the children to the DHS office later.
¶ 10. Roughly forty minutes after Biele-feld and Snowden first arrived, Cole opened the door. She was naked from the waist up, and the police officers ordered her to get dressed. Around this same time, the children appeared at the door in their underwear. They had dirty feet, ungroomed hair, food remnants on their chests, and did not appear to have just bathed. Cole then screamed into S.’s ear that he was not going with her anymore, but he was going with the officers and DHS workers. Because of Cole’s erratic behavior and her concern for the well-being of S. and S.C., Bielefeld contacted the youth court and requested that DHS receive temporary custody of the children. The children were temporarily placed in the custody of the Lauderdale County Office of Social Services.
¶ 11. On October 9, 2007, the youth court judge conducted a shelter hearing. After hearing testimony, the youth court found there was no reasonable alternative but to hold the children in custody due to the emergency circumstances. The youth court judge instructed the Office of Social Services to make all reasonable efforts to re-unify the children with their family, but granted both physical and legal custody of the children to the Lauderdale County DHS. In addition, the youth court judge required that Cole and S. undergo psychological and mental evaluations.
¶ 12. On October 17, 2007, the youth court authorized the filing of a formal petition for adjudication of neglect. The petition was filed the same day, and ah adjudicatory hearing was held on November 29, 2007.
¶ 13. At the hearing, Bielefeld, Snow-den, and Meridian Police Officer Robert Rivers testified about the October 5, 2007, events that transpired at Cole’s apartment. Denice Knight, an elementary administrator at Clarkdale Attendance Center, also testified at the hearing. Knight had previously spoken with Cole about her children’s residency. Cole had told Knight that the children could not live with her. According to Knight, Cole admitted she was an alcoholic, had no electricity at her apartment, and had alcohol bottles strewn all over her home. Cole also told Knight she was concerned with herself first, and would either take the children to DHS, or DHS could come get them. The children had no attendance problems on file, but Knight noted a disciplinary problem with S., about which Cole did not appear concerned.
¶ 14. Both Cole’s mother, Addie Jim-merson, and Shelton testified on Cole’s *718 behalf. Shelton claimed Cole did not binge drink or sleep on his sofa. He further testified that the children were never afraid of their mother, and the children actually lived in his home. He added that Cole had several medical problems but had never been diagnosed with any psychological disorders.
¶ 15. Jimmerson testified that she was on the phone with Cole some of the time that Bielefeld, Snowden, and the police officers were outside of Cole’s apartment. She also testified about Cole’s medical problems. Jimmerson maintained that Cole was a good mother and had never been diagnosed with any psychological disorders. Though Shelton and Jimmerson were not present at Cole’s apartment on October 5, 2007, neither considered Cole’s actions that day unusual.
¶ 16. Cole also testified at the hearing and attempted to explain why she refused to open the door for the social workers. According to Cole, her clothes were covered in blood because of a medical condition that causes hemorrhaging. She claimed she was nude because she had just removed her bloody clothes. However, Cole could not explain why it took her forty minutes to open the door, or why she appeared topless in the doorway. She also denied having any alcohol-related or mental-health problems.
¶ 17. Cole received a psychological evaluation from Pine Grove Outreach Center, and a second evaluation in Ohio, where she presently lives.[2] She pointed out that neither of these assessments indicated substance-abuse problems or other mental-health issues. However, the youth court recognized Cole may have withheld facts surrounding the October 5, 2007, events. The youth court also acknowledged that Cole had not attended any follow-up counseling sessions.
¶ 18. After hearing testimony and personally questioning Cole, the youth court judge adjudicated S. and S.C. neglected. Specifically, the youth court judge determined the investigation of the children’s residency was appropriate, and found Cole’s actions on October 5, 2007, sufficient grounds for adjudicating the children neglected. The court granted physical custody of the children to their paternal grandmother and granted legal custody to the Lauderdale County DHS. Cole was granted supervised visitation, and Shelton was granted unsupervised visitation. DHS provided Cole a service plan or service agreement. Under this plan, if Cole satisfies certain criteria, she can once again regain custody of her children.[3] The court also reviewed Cole’s service agreement with DHS and informed Cole that as she progresses with the agreement, she will be eligible for unsupervised visitation.
STANDARD OF REVIEW
¶ 19. In reviewing a youth court’s adjudication of neglect, we consider “the evidence before the [yjouth [cjourt in the light most favorable to the State.” In re C.R., 604 So.2d 1079, 1083 (Miss.1992). “If the evidence so considered is opposed to the finding of the [yjouth [cjourt with such force that ‘reasonable men’ could not have found as the [yjouth [cjourt did by a preponderance of the evidence, this Court must reverse.” Id.
DISCUSSION
¶ 20. Cole argues there was insufficient evidence before the youth court to remove *719 her children from her custody. Before addressing her argument, we pause to point out that this case does not concern the drastic measure of termination of parental rights. Rather, it involves an adjudication of neglect under Mississippi Code Annotated section 43-21-561 (Rev.2009), and the subsequent removal of children from a parent’s home pursuant to Mississippi Code Annotated section 43-21-609 (Rev.2009). Because of the nature of this action, we are directed to apply a reasonableness review, not the elevated review required when a parent’s rights are terminated. See In re C.R., 604 So.2d at 1083.
I. The Youth Court’s Duties
¶ 21. Though a child’s welfare “is presumed to be best promoted by parental custody .... the State has the duty to assume the responsibilities which the parent has discarded.” Reynolds v. Davidow, 200 Miss. 480, 483-85, 27 So.2d 691, 692 (1946).
¶ 22. Mississippi Code Annotated section 43-21-103 (Rev.2009) provides the following pertinent statement about our youth court’s duties to children:
It is the public policy of this state that the parents of each child shall be primarily responsible for the care, support, education and welfare of such children; however, when it is necessary that a child be removed from the control of such child’s parents, the youth court shall secure proper care for such child.
¶ 23. As in all child-custody cases, “the cardinal principle to be applied to custody decisions is that which is in the best interest[] and welfare of the minor child.” In re R.D. and B.D. v. Linda D., 658 So.2d 1378, 1386 (Miss.1995) (citing Albright v. Albright, 437 So.2d 1003, 1004 (Miss.1983)); Brown v. Brown, 237 Miss. 53, 112 So.2d 556 (1959). This principle applies equally to actions such as the present case where DHS seeks to retain custody of neglected children. In re R.D. and B.D., 658 So.2d at 1387.
II. Adjudication of Neglect
¶ 24. Mississippi Code Annotated section 43-21-105(( )(i)-(iv) (Rev.2009) provides the following pertinent definitions of a “neglected child”:
(il) “Neglected child” means a child:
(i) Whose parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support ... or other care necessary for his well-being; ... or
(ii) Who is otherwise without proper care, custody, supervision or support; or
[[Image here]]
(iv) Who, for any reason, lacks the care necessary for his health, morals or well-being.
¶ 25. Once a youth court conducts an adjudicatory hearing and finds by a preponderance of the evidence a child has been neglected, several statutory alternatives apply. The dispositional alternatives available to the youth court are set forth in section 43-21-609 and include: (1) release the child with no further action; (2) place the child in the custody of a parent, relative, or other person with limitations as the court prescribes; (3) order treatment of the child or parent; (4) order youth court personnel, DHS personnel, or child-care agencies to assist the child and parent in obtaining social or medical services; or (5) place the child in the custody of DHS or other organization found suitable by the court.
¶ 26. Here, the youth court found Cole neglected both S. and S.C., and ordered the children to be placed in the legal custo *720 dy of DHS and the physical custody of their paternal grandmother. These specific dispositional alternatives are expressly authorized by Mississippi Code Annotated section 43-21-609(b).
¶ 27. The youth court determined Cole’s October 5, 2007, actions were sufficient to adjudicate the children neglected. Cole’s standoff with social workers and the police weighed heavily in the youth court’s decision.
¶ 28. During this episode, Cole declared her intention to bring the children to DHS. She had made similar comments to Knight, about bringing her children to DHS, when they spoke regarding the school-district problems.
¶ 29. Cole informed the social workers and police officers that her children were bathing, but once the door was opened, the children appeared in their underwear, with dirty feet, and food on their chests. Cole also claimed, many times, that she was preparing to leave for a funeral. But, in front of the social workers and police officers, she appeared topless in the doorway of her apartment. Bielefeld contacted the youth court because of Cole’s apparent instability and erratic behavior.
¶ 30. Both children had previously informed Bielefeld they were afraid to be home with their mother. Because of the events she witnessed on October 5 and the children’s fear of their mother, Bielefeld contacted the youth court. The youth court was forced to act quickly.
¶ 31. The facts here support the youth court’s finding that, at minimum, these children were not being provided the “proper and necessary care or support ... or other care necessary for [their] well-being[.]” Miss.Code Ann. § 43-21-105(i)(i)- This Court will not ordinarily reverse a trier of fact unless it can be said with confidence that the finding was manifestly wrong. In re I.G., 467 So.2d 920, 924 (Miss.1985). The youth court was presented with conflicting testimony about Cole’s care and support for her children. Based on Cole’s alarming actions and statements that she would turn the children over to DHS, we cannot conclude with confidence that the youth court judge’s decision was manifestly wrong. Id.
¶ 32. We find that considering the evidence in a light most favorable to the State, a reasonable person could have found, by a preponderance of the evidence, both children were neglected. Furthermore, we defer to the youth court judge’s observation of the temperament, maturity, and demeanor of the children and parents. See In re M.R.L., 488 So.2d 788, 792 (Miss.1986). We also note that Cole was provided a service plan by DHS. As she progresses with the plan, she will be eligible for unsupervised visitation; and ultimately, upon compliance with the plan, the children could be returned to Cole’s custody. Finding no error, we affirm the judgment of the Lauderdale County Youth Court.
¶ 33. THE JUDGMENT OF THE LAUDERDALE COUNTY YOUTH COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ„ CONCUR.

. To protect the confidentiality of the minors, we substitute initials for their names.

. The exact date Cole moved to Ohio is not clear. However, the record reflects she lived in Ohio on November 29, 2007, the date of the adjudicatory hearing.

. The service plan is referenced in the youth court transcript, but it was not included in the record.